539 So.2d 897 (1989)
Edwin A. MULLET, III,
v.
STATE of Louisiana, Through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, et al.
No. 88-CA-0041.
Court of Appeal of Louisiana, Fourth Circuit.
February 16, 1989.
Writs Denied April 28, 1989.
*898 Sidney D. Torres, III, Gregory J. Noto, Roberta L. Burns, Law Offices of Sidney D. Torres, III, Chalmette, for appellee.
William J. Doran, Jr., Frank J. Gremillion, Baton Rouge, for appellants.
Before BYRNES, LOBRANO and WARD, JJ.
LOBRANO, Judge.
Plaintiff, Edwin A. Mullet, III, instituted these proceedings against defendants Brian A. Perez and the State of Louisiana, Department of Transportation and Development (DOTD) seeking recovery for injuries he received when his motorcycle collided with Perez's vehicle at the intersection of Louisiana Highway 39 (Judge Perez Drive) and Louisiana Highway 46 (St. Bernard Highway) on December 1, 1984. The claim against Perez is based on his negligence for failing to safely execute a left turn; the claim against DOTD is for negligence in failing to provide adequate signalization, illumination and striping at the intersection. After a bifurcated[1] judge trial, Mullet was awarded damages in the amount of $7,568,943.7985% apportioned to the negligence of the DOTD and 15% apportioned to the negligence of Perez. From this judgment only the DOTD appeals.
FACTS:
Where the accident occurred, Judge Perez Drive runs in a north-south direction and St. Bernard Highway runs in an east-west direction. Judge Perez Drive is a four lane roadway with two lanes running north and two lanes running south separated by a wide median. St. Bernard Highway is a rural two lane roadway with one lane running east and one lane running west. Judge Perez Drive terminates at St. Bernard Highway forming an intersection in the shape of a "T". A blinking amber/red light is located at the intersection of the *899 southbound lane of Judge Perez Drive and St. Bernard Highway. There were no other traffic signals. Located approximately 200 feet east of the intersection is a Louisiana Power and Light (LP & L) facility. At the time of the accident, the LP & L facility was utilizing a security system consisting of bright white lights. These lights were installed low to the ground and were at a sufficient distance from the intersection to be at or near a line of view approximating that of the headlights of westbound vehicles approaching Judge Perez Drive. There were no streetlamps near the intersection to illuminate it or to reduce the effect upon approaching motorists of the background lighting coming from the LP & L facility.
The median between the northbound and southbound lanes of Judge Perez Drive does not extend all the way to St. Bernard Highway. The median ends some 12 to 15 feet before the intersection. The recessed area is paved and unmarked. At the time of the accident there were no markings on the roadway to allow a motorist to distinguish the location of the median in relation to the shoulders of the north and southbound lanes of Judge Perez Drive or to indicate the proper route that an eastbound motorist should take to safely negotiate a left hand turn from St. Bernard Highway onto the northbound lanes of Judge Perez Drive.
On December 1, 1984, at approximately 8:13 p.m., Mullet was driving his motorcycle in a westbound direction on St. Bernard Highway. At the same time, Perez was driving his automobile in an eastbound direction on St. Bernard Highway. Both men were approaching the intersection. It was Perez's intention to turn left onto the northbound lanes of Judge Perez Drive. As he approached the intersection, he became confused as to the exact location of the northbound roadway and slowed down in order to ascertain its location. He looked to the east down St. Bernard Highway for approaching traffic. He did not see Mullet approaching and commenced his left turn across Mullet's lane of traffic. Mullet collided with the right rear portion of the automobile. He was thrown to the left and struck a utility pole sustaining severe injuries.
The DOTD appeals the trial court's judgment asserting the following specifications of error:
AS TO LIABILITY
1) The trial court erred in adopting as "expert" in the field of traffic engineering, the testimony of Mr. B.M. Dornblatt, a civil engineer with no training or experience in the field of traffic engineering and in refusing to accept the testimony of Dr. Joseph Blaschke, a qualified traffic engineer;
2) The trial court erred in finding that the DOTD was negligent or at fault in connection with the accident;
3) The trial court erred in finding that the intersection involved was improperly signalized or that the blinking amber-red light was improperly placed;
4) The trial court erred in finding that the intersection was improperly designed;
5) The trial court erred in finding that the DOTD was negligent in not placing turning markers at the intersection prior to the accident.
AS TO DAMAGES
6) The trial court erred in finding that Mullet's present marriage will ultimately end in divorce;
7) The trial court erred in adopting, without basis, the most expensive of the alternative life care health plans suggested by Mullet's expert;
8) The trial court erred in awarding an excessive amount to Mullet for general damages;
9) The trial court erred in failing to limit the state's liability for general damages to $500,000.00 pursuant to La.R.S. 13:5106(B)(1).
SPECIFICATION OF ERROR 1:
The DOTD asserts that the trial court erred in adopting the testimony of B.M. Dornblatt over that of Dr. Blaschke. The DOTD contends Dornblatt lacks expertise in the field of traffic engineering.
*900 During the inquiry into his qualifications, Dornblatt testified that he is a civil engineer with the majority of his work being in the field of highway design and signalization. Although he testified that he was not a traffic engineer per se, he was required to know traffic engineering in order to design highway projects.[2]
Mullet tendered Dornblatt as an expert in the field of engineering particularly as it pertains to highway design and safety. Following a brief voir dire examination, the DOTD submitted the matter for the court's decision. The court accepted Dornblatt as an expert in the field in which Mullet tendered him. The DOTD did not object.
Code of Civil Procedure Article 1635 provides:
"Formal exceptions to rulings or orders of the court are unnecessary. For all purposes it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court and his grounds therefor; and, if a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection does not thereafter prejudice him."
Thus, except where a party was not afforded an opportunity to object to an evidentiary ruling, a contemporaneous objection is necessary for appellate review. Cooper v. AMI, Inc., 454 So.2d 156 (La. App. 1st Cir.1984), writ den. 459 So.2d 539. Since the DOTD had every opportunity to object at the time of Dornblatt's acceptance but failed to do so, it has waived its right to do so on appeal. Furthermore, we find that Dornblatt's credentials support his qualification as an expert, and there is no error in the trial court's acceptance of him as such.
The fact that the court gave greater weight to the testimony of Dornblatt than that of Dr. Blaschke is a credibility assessment clearly within the province of the trier of fact and will only be disturbed upon a showing that the trial court's findings constitute manifest error. In his reasons for judgment the trial court stated that it was "extremely impressed" with Dornblatt's credibility and expertise. In referring to Dr. Blaschke's testimony, the court stated:
"The defense called Dr. Joseph Blascke, [Blaschke] an engineer from Texas A & M University who regularly testifies in such matters for highway departments around the country, who said that lighting of a rural intersection is not usually required and that there was nothing wrong with the intersection, the accident having been entirely the fault of the driver who made a left turn in front of the plaintiff. The Court concludes that, while Dr. Blascke was not the typical "hired gun," he did lean too heavily toward advocating the position of the DOTD and never gave any plausible reason for this Court to believe, especially in view of the testimony of Ms. Crane, Mr. Gautreaux of the DOTD, and Mr. Perez, that the intersection was not hazardous and that such conditions existing there were not the predominant cause of the accident in this case. The law is clear that the Court is not bound to accept even the uncontradicted opinion testimony by experts. Opinion evidence is given to assist the Court in determining the ultimate fact, differing from testimony to a fact. In all cases, the possible bias *901 of the witness in favor of the side for whom he testifies bears upon the weight of his testimony. State, Dept. of Highways v. McPherson, 261 La. 116, 259 So.2d 33 (1972). This Court was given no reason to favorably assess the testimony of Dr. Blascke to find this intersection to have been reasonably safe for prudent drivers. Accordingly, such testimony will be credited only when consistent with the finding by this Court that the intersection was unreasonably dangerous at night under the circumstances presented by this case."
Thus, we find no error in the trial court's giving more weight to Dornblatt's testimony than to that of Dr. Blaschke.
This specification of error is without merit.
SPECIFICATIONS OF ERROR 2, 3, 4 AND 5:
The issue presented by these specifications of error is a factual onewas the trial court clearly wrong in determining the DOTD was negligent in not providing proper signalization, striping or illumination at the intersection.
The following testimony was adduced at trial.
BOYD T. GAUTREAUX
Boyd T. Gautreaux, at the time of the accident, was the traffic operations engineer for the DOTD in the St. Bernard area. It was his function to study the highways and intersections within his district and make recommendations for appropriate signalization, traffic signs and traffic markings.
He testified that following the completion of the intersection, he determined that the appropriate signalization would be a flashing amber/red light. The flashing red light would control the southbound lanes of Judge Perez Drive while the flashing amber or "caution" was to alert motorists approaching from St. Bernard Highway. He stated that his original plan was that the light be installed in the exact center of the intersection. He stated, however, that the maintenance crew installed it in the center of the intersection of the southbound lanes of Judge Perez Drive with St. Bernard Highway. He testified that once he inspected the installation he determined the location to be a better one and approved the installation.
He further stated that sometime in October, 1984, Mrs. Vivian Crane contacted the DOTD to complain of the hazardous conditions at the intersection. Gautreaux stated that in response to Crane's complaint, a study was made of the intersection and it was determined that it would be beneficial to place markings on the pavement to guide left turning motorists onto Judge Perez Drive. He recommended reflective thermoplastic tape for better wear and visibility. He stated that although this recommendation was made in October, the tape was not installed until April (four months after the accident) because the glue required warmer temperatures. The only reason he gave for not temporarily using reflective paint was that it doesn't wear as well and would have to be sandblasted off to install the thermoplastic tape. Gautreaux also stated that the separation between the northbound and southbound lanes of Judge Perez Drive is so great that under state law they are considered to be two intersections.
SERGEANT DAVID MOREL:
Sergeant Morel was the accident investigating officer. He testified that the traffic light was operational on the night of the accident. His investigation showed that Mullet struck the right rear side of the Perez vehicle and that Mullet was thrown some distance and struck a utility pole.
VIVIAN B. CRANE:
Mrs. Crane testified that prior to October of 1984, she had traveled the intersection approximately four times at night. When traveling in an easterly direction on St. Bernard Hwy. (the same direction in which Perez was traveling), and then turning left on Judge Perez, she observed:
"Well, I tended as I said, I tended to overshoot. I would come over and hit, be headed toward the shoulder and then have to go back. I was afraid thatin doing that, you have to almost, or I had to almost slow down in order to see *902 where I was going. If there was somebody in back of me, I was afraid of getting rearended. If I didn't make the turn swift enough and slowed down to see where I was going, I was afraid of getting it this way, even though I would have allowed myself ample time to do that."
She further testified that she found the lights from the LP & L facility to be very very bright, and stated, "... and I was blinded completely by not only that, but also by the headlights of oncoming vehicles."
BRIAN A. PEREZ
Perez was the left turning motorist whose vehicle was struck by Mullet. He testified as follows:
"I recall seeing the lights in front of me, the lights from LP & L system. Well, before that, I seen the flashing lights. I slowed down. I looked. As far as I knew, there was nothing coming, you know. I didn't see no lights or nothing, but its been a long time. I still can picture the lights in my head, you know, of seeing the LP & L lights. I remember turning. I thought I was off the road, and I remember impact.
Q. Did you slow as you neared the flashing lights?
A. Yes.
Q. Is it fair to say that
A. Almost to a stop.
Q. Is it fair to say as you passed the flashing lights, you were then concentrating on where to turn?
A. That's correct. After I looked to see if anything was coming, then, I proceeded to turn.
* * * * * *
Q. When you got to this intersection on the night of the accident, did you stop before you made, started your left turn?
A. Not completely.
Q. You did not come to a complete stop?
A. No.
* * * * * *
When asked why he was not able to see Mullet's motorcycle, Perez stated:
A. There weren't no vehicles coming that I know of.
Q. Well, would you agree that, apparently, Mr. Mullet was coming?
A. Yeah, I agree.
Q. My question, though, since you looked and did not see anything coming, can you account for the fact that you did not see his vehicle, his motorcycle?
A. The only thing I can see, maybe the lights from this plant here blended in with this one headlight, or if he didn't have a headlight at all. That's the only thing."
The DOTD stipulated that Mullet was unable to testify because of his injuries and agreed that the absence of his testimony would not be raised against him.
B.M. DORNBLATT:
B.M. Dornblatt, an expert in the field of highway design engineering and safety testified that the intersection was defective in that there were no pavement markings to enable drivers to safely and expeditiously negotiate a left turn. In addition, he stated the absence of proper illumination affected the ability of drivers to make a left turn without delay in order to locate the roadway.
He cited information in the Association of State Highway Officials manual to the effect that driver confusion could cause a delay of between 2 and 5 seconds in making a decision. He stated that once Perez began his left turn he became confused as to the location of the roadway. Because the intersection was unmarked, he had to slow down to find the route. This confusion caused the delay in clearing the roadway in front of Mullet's motorcycle.
In addition, he testified that in view of the bright background lights from the LP & L facility, illumination by street lights was necessary to reduce the effect upon visibility by the glare of the background lighting. He referred to the provisions of the manual on Uniform Traffic Control Devices, Section 3A, relative to markings of the roadway as traffic control devices. He stated that because of the unusual nature of the intersection, it was necessary, especially *903 in view of the caution light location, to "channel" traffic through a left turn in order to eliminate the confusion caused by the design, construction and ambient lighting conditions of the intersection. Besides offering his expert testimony, Dornblatt testified to observing drivers stop under the caution light and then initiate a premature left turn some 40 feet before reaching the roadway.
It was his opinion that the delay to locate the roadway resulting from the unlit, unsignalized and unmarked intersection was the principal cause of the accident.
DR. JOSEPH BLASCHKE:
Dr. Joseph Blaschke, an expert in the fields of highway design and traffic engineering, testified on behalf of the DOTD. He stated that he had visited the scene of the accident several times and that in his opinion there was nothing improper in the design. He further testified that the flashing amber/red light was the appropriate signal. He stated that the function of the flashing light is not to advise traffic of where to make a left turn but to mark the point of a potential hazard. Here, he contended the hazard was in connection with a possible collision between southbound traffic on Judge Perez Drive and east and westbound traffic on the St. Bernard Highway. Since all traffic on the northbound lanes of Judge Perez Drive is moving away from St. Bernard Highway, there is no hazard to warn against. Thus, he opined the caution light was properly placed. Dr. Blaschke's testimony, however, does not address what signalization or markings are proper and necessary to guide eastbound left turning motorists to safely cross over the westbound lane of St. Bernard Highway unto the northbound lane of Judge Perez.
The trial court, in finding the DOTD negligent, stated:
"... There are no traffic signal lights located within more than 40' of the intersection of Highway 46 and the northbound lanes of Highway 39. Because of the distance separating the northbound and southbound lanes of Highway 39 and the distance between the flashing traffic control signals and the northbound lane of Highway 39, that portion of the intersection is essentially uncontrolled by any traffic signals at all. The existence of the traffic control signals at the end of the southbound lane, with no signalization of the distant northbound lane, confuses and even deceives drivers with respect to the proper place to commence executing a left turn from Highway 46 to the northbound lanes of Highway 39. Moreover, it misinforms westbound drivers of the location of the intersection, making them believe the intersection to be farther away than it actually is. As will be more fully demonstrated below, during the discussion of the testimony of Ms. Vivian Crane and Mr. Boyd Gautreaux, the Louisiana Department of Transportation and Development had actual knowledge of the conditions existing at this dangerous intersection well in time to have done something about it before the tragic consequences of the accident in this case occurred.
To compound the situation, LP & L has a facility approximately 200' east of the intersection which, at the time of the accident in this case, had bright white security lights surrounding it. The brightness of those lightsas testified by plaintiff's expert, Mr. B.M. Dornblatt, with whose credibility and expertise this Court was extremely impressedhad the effect of making the unlighted intersection of the two highways appear darker to eastbound motorists on Highway 46 who were driving in the direction of those lights. Moreover, their presence blended with the headlights of oncoming traffic approaching from the east on Highway 46, disguising the headlights of such approaching westbound traffic, thus explaining Mr. Perez' failure to see the plaintiff approaching from the west. Of course, the Department of Transportation and Development is not responsible for the presence of the LP & L lights in the background, but it should have taken their presence into consideration when designing and maintaining the intersection, especially after the complaint of Ms. Crane about their effect *904 upon visibility there and the inspection of the intersection by the DOTD and Mr. Gautreaux' recognition that traffic conditions there required improvement `especially at night.'
* * * * * *
Whether or not lighting is usually required in a rural intersection, this Court finds that this intersection was an unusual one and that lighting of the intersection would have been one method to have reduced the problems which contributed to driver confusion, both with respect to the presence of on-coming traffic and the location of the pathway to be taken to reach the left lane of Highway 39 North. The totality of circumstances at the intersection were such that some action was required to have been taken by the DOTD to render less hazardous the situation faced by motorists at that intersection.
There were several options available to the DOTD, none of which were very expensive and all or any of which could have been easily performed to aid drivers using that intersection to safely negotiate the foreseeable ordinary operations of left turning vehicles at that location. Lighting the intersection would have reduced the effect of the glare and resulting contrast to eastbound motorists and that would have enabled them better to see the appropriate pathway for executing a left turn from Highway 46 to East Judge Perez Drive. Marking the turn route, especially in view of the location of the traffic control signals and the width of the median separating the distant side of East Judge Perez Drive, would have safely guided left-turning motorists through the intersection. Erecting the traffic control signals in the manner originally designed by the DOTD would have enabled drivers to identify the center of the intersection and to thereby permit them to recognize the proper turning radius to execute a left turn into the northbound lanes of East Judge Perez Drive. Dr. Blascke and Mr. Dornblatt both testified that caution lights are placed where there is a potential for collision between vehicles at an intersection. Because the northbound and southbound lanes were separated by such a wide median, their intersections with St. Bernard Highway should be treated as separate intersections. The absence of a caution light at the point where left-turning motorists would cross in front of right-of-way motorists is a consideration the Department should have made in designing the intersection or, as it subsequently did, in changing the design to move the caution lights farther away from such a point of potential conflict. The DOTD could have easily added, without significant expense, another set of caution lights at the intersection of Highway 39 North and Highway 46 to inform drivers approaching from the east of the potential for left-turning motorists to turn in front of them at the point where St. Bernard Highway intersects with East Judge Perez Drive heading toward Chalmette.
As a final factor which rendered the intersection unsafe and confusing to drivers, the median of East Judge Perez Drive was set back quite some distance from the edge of Highway 46at least the full width of another lane of traffic. In the darkened, unmarked intersection there were no readily discernible points of reference to identify the location of the median and the turning route into the northbound lanes of East Judge Perez Drive. Drivers commencing a left turn from Highway 46 to East Judge Perez Drive were faced with a broad expanse of unmarked pavement which confused them as to the location of the roadway."
We find no manifest error in the ruling of the trial court. The evidence well supports the finding of negligence on the part of the DOTD in failing to properly signalize, mark and illuminate the intersection. This failure on the part of the DOTD was the principal cause of the accident. See, Ledbetter v. State Department of Transportation and Development, 482 So.2d 1035 (La.App. 3rd Cir.1986), affd. 502 So.2d 1383 (La.1987).
These specifications of error are without merit.

*905 SPECIFICATIONS OF ERROR 6 AND 7:
Mullet was twenty four years old at the time of the accident. His injuries consisted of an open fracture of the left tibia and fibula, a closed fracture of the right medial malleolus, a closed fracture of the right femur, an open fracture of the right wrist involving the lunate and navicular bones and disruption of two major tendons in the wrist, a severed radial nerve in the right wrist, a non-displaced fracture of the left tibial plateux, a depressed fracture of the right knee with an associated avulsion fracture of the spinous process, a basilar skull fracture and an associated closed head injury. He sustained an injury to his brain which partially severed the brain stem from the upper part of the brain. These injuries resulted in partial paraplegia (Mullet has some gross control over his extremities but no fine motor control). He is unable to speak and suffers other neurological problems including difficulty in closing his mouth and chewing. He has difficulty with balance and requires braces to stand. He is unable to perform simple tasks such as bathing, feeding himself, walking, dressing, etc. He is confined to a wheelchair. He can only take a few steps with the aid of a walker and leg braces. He suffers from "locked in syndrome" a condition in which he is aware of his environment and what is going on around him but is unable to communicate his needs, thoughts, feelings and desires. He communicates by hand gestures in response to "yes" and "no" questions.
Dr. Robert Voogt testified as to Mullet's immediate needs in a post-acute institutional care program required for a period of between 12 to 24 months and to his long term needs both in a spousal environment and in an institutional environment.
The post-acute institutional care programs were estimated on the basis of the mean period of 18 months. Dr. Voogt discussed programs in Arkansas and Folsum, Louisiana both costing $445.00 per day and a less expensive one in Texas costing $250.00 per day. He recommended the Arkansas program with eventual transfer to Folsum when that program opened so that he could be closer to his family. He did not recommend the Texas program because the type of care and hilly terrain was not suited to non-ambulatory patients such as Mullet.
Dr. Voogt is a specialist in confecting life-care plans for brain-injured patients. He testified as to three possible plans that would meet Mullet's needs for the duration of his life and the estimated costs of these plans. One was in a spousal environment and two were in institutional environments. Mullet's projected life span was estimated to be 47 years.
All three plans included an attendant of some sort to assist with therapy and to see to Mullet's day to day needs. In addition, the cost of various medical treatments and the estimated costs of such items such as wheelchairs and a specialized van for travelling were considered. The life care plan was to begin once the post-acute program was completed.
The program in a spousal environment was estimated at $2,456.965.00. The two total institutional care programs were estimated at $3,458,260.00 and $4,404,745.00 at $250.00 per day and $445.00 per day, respectively.[3]
Based on Dr. Voogt's testimony that 80% of all marriages of brain damaged persons end in divorce, the court awarded a hybrid sum of $4,000,000.00 on an initial spousal environment followed by total institutional care. In awarding this amount the court stated:
"While recognizing the high propensity for the plaintiff's marriage to end in divorce, this Court cannot ignore the fact that the marriage is presently intact and that the total institutional environment is not presently required for the treatment of Mr. Mullet. It would be unfair to the State to award the plaintiff the full costs of a sustained care program in an institution. It would be more unfair, however, to limit plaintiff's recovery to the amount required for his care in a spousal environment when there is such a high probability *906 that his marriage will end in divorce. All factors considered, this Court is of the view that the future care and treatment of the plaintiff for the balance of his 47 years life expectancy will require the award, at this time, of the amount of $4,000,000.00. Such an award recognizes the probable hybrid situation where plaintiff will have the assistance of his wife for a time but will ultimately require sustained institutional care."
The DOTD argues that the trial court erred in awarding an amount for future life-care premised on an 80% probability that Mullet's marriage would end in divorce. In support thereof they cite Landry v. Bill Garrett Chevrolet, Inc. 443 So.2d 1139 (La.App. 4th Cir.1983), writ denied 445 So.2d 441 (La.1984), as well as the testimony of Mullet's wife.
In Landry, supra, this Court refused to award future medical expenses where there was no evidence suggesting a need for future institutionalization. The only evidence was the opinion that "plaintiff would continue to deteriorate and may be unable to be cared for by his wife." In reversing the future medical award we reiterated the jurisprudence that it may not be based on mere conjecture or speculation.
However in the instant case there is no doubt the evidence clearly substantiates the need for Mullet's future institutionalization. And, Dr. Voogt's testimony suggests that it is more probable than not that Mullet will not have the assistance of his spouse sometime in the future. Although Mrs. Mullet testified she has no intention of leaving her husband, and that she still loves him, it is apparent the trial court weighed her testimony along with Dr. Voogt's and all of the circumstances of this case in arriving at the award for future expenses. The award is not based on pure speculation or conjecture and is supported by evidence of probative value. We cannot conclude that the trial judge is clearly wrong in this regard.
SPECIFICATIONS OF ERROR 8 AND 9:
The trial court awarded $3,000,000.00 in general damages for past and future pain and suffering, mental anguish and loss of enjoyment of life. The DOTD argues this award is excessive, and that La.R.S. 13:5106(B)(1) limits a general damage award against the state to $500,000.00.
Considering the facts and circumstances of this case and the injuries sustained by Mullet, we do not agree that the damage award is excessive. However, we do agree that R.S. 13:5106(B)(1) is applicable, and thus reduce the award to $500,000.00.
Act 452 of 1985, codified at R.S. 13:5106(B)(1) provides:
"In any suit for personal injury, the total amount recoverable, exclusive of medical care and related benefits and loss of earnings, and loss of future earnings, as provided in this Section, shall not exceed five hundred thousand dollars."
Plaintiff's accident occurred December 1, 1984. Suit was filed July 9, 1985 and Act 452 became effective September 6, 1985.
DOTD argues that the statute is remedial and should be applied retroactively. Plaintiff contends that retroactive application would divest his vested right to recover damages for the injuries he sustained since prior to Act 452 there was no limitation on recoverable damages.
Civil Code Article 6 provides:
"In the absence of contrary legislative expression, substantive laws apply prospectively only. Procedural and interpretative laws apply both prospectively and retroactively, unless there is a legislative expression to the contrary."
Article 6 is a reproduction of the substance of former Civil Code Article 8 and the jurisprudence interpreting that Article. However, this jurisprudential rule of retroactivity is subject to the exception that "procedural and remedial laws are not accorded retroactive effect where such retroactivity would operate unconstitutionally to disturb vested rights." Lott v. Haley, 370 So.2d 521, 523 (La.1979).
We are of the opinion that Act 452 of 1985 is procedural in nature in that it deals with a remedy, rather than a substantive right. It falls within the category of so-called "remedial legislation". See, Civil Code Article 6, Comment (d). A reasonable *907 limitation on the amount of the recovery does not abridge or violate Mullet's right or cause of action against the State. And it does not divest Mullet of a vested right. The mere expectancy of a future benefit does not constitute a vested right. Clements v. State Dept. of Health, 391 So.2d 66 (La.App. 4th Cir.1980), writ refused 396 So.2d 932. "A right is vested when `the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. The right must be absolute, complete and unconditional, independent of a contingency ...'" Id. at 68. Mullet's amount of recovery is not a vested right until it is definite and certain. That is, at the time of the accident he only had a mere expectancy of recovery, contingent upon proof of liability. And, even after obtaining a final judgment Mullet's right to recovery is still subject to legislative approval for payment. La. Const. Art. 12, Sec. 10. Thus, we are satisfied retroactive application of Act 452 does not disturb any vested rights.
We are aware of Hellmers v. Dept. of Transportation & Development, 503 So.2d 174 (La.App. 4th Cir.1987), writ denied 505 So.2d 1141 where we expressed the belief that R.S. 13:5106 should not be applied retroactively under the facts and circumstances of that case. However, the distinguishing aspects of Hellmers are (1) the plaintiff obtained his judgment, albeit not final, prior to the act's effective date, thus arguably giving him a vested right, and (2) the DOTD's actual responsibility would not exceed the $500,000.00 limit. We conclude Hellmers is not controlling in the present case.
For the above and foregoing reasons, the judgment of the trial court is affirmed as to liability. The damage award is amended as follows:

Cost of future life-care Plan $4,000,000.00
Past Medical Expenses 184,446.79
Past lost wages 37,028.00
Lost earning capacity 347,469.00
Past and future pain and suffering,
mental anguish and
loss of enjoyment of life 500,000.00
 _____________
 Total $5,068,943.79

AMENDED, AND AS AMENDED, AFFIRMED.
NOTES
[1] Liability and damages were tried separately.
[2] Dornblatt's Curriculum Vitae which was introduced into evidence reads as follows:

He received a Bachelor of Science degree in civil engineering from the University of Georgia in 1924 and a masters degree in civil engineering from Georgia Tech in 1934. He is a graduate of the army engineer school, having spent six years in the United States Army working in the field of heavy construction including the construction of roadways. He has been employed by the states of South Carolina and Georgia in their highway departments in the field of road and bridge design. He is a registered engineer in nine (9) states and holds a national registration as a professional engineer. He currently belongs to numerous professional societies, including the American Society of Civil Engineers, the engineering section of the American Road Builders and the International Association of Bridge and Structural Engineers. He has testified as an expert in civil engineering in the courts of Mississippi, Louisiana and the United States.
[3] These costs are the discounted present day values as testified by Dr. Wolfson.