576 So.2d 630 (1991)
Josie HAMPTON, Curatrix of Cathy Hampton, and Tutor of Tananka Hampton
v.
Holly F. GREENFIELD, M.D., Karen Miller, M.D., M. Reyes, Charles Smith, M.D., State of Louisiana Department of Health and Human Resources.
No. 90-CA-0852.
Court of Appeal of Louisiana, Fourth Circuit.
March 14, 1991.
Rehearing Denied April 10, 1991.
Writ Denied June 14, 1991.
*631 Joseph W. Thomas, Henry Julien, New Orleans, for plaintiff-appellant Josie Hampton.
William J. Guste, Jr., C.T. Williams, Jr., Sp. Asst. Atty. Gen., Blue, Williams & Buckley, Metairie, for defendants/appellants.
G. Frederick Kelly, III, Sp. Asst. Atty. Gen., Kelly and Davenport, New Orleans, for defendants/appellants.
Before KLEES, BYRNES and WILLIAMS, JJ.
KLEES, Judge.
Plaintiff Josie Hampton brought this medical malpractice action against the State of Louisiana; Charity Hospital of New Orleans; two medical residents employed by Charity, Drs. Smith and Greenfield; and a Student Registered Nurse Anesthetist (SRNA), Marcus Reyes. Plaintiff is the mother of Cathy Hampton, who, while being treated at Charity, suffered cardiac arrest and lapsed into a coma for seven days, from which she emerged mentally and physically impaired. Following a jury trial, with respect to the individual defendants and by the trial judge with respect to the State the district court entered judgment in favor of plaintiff against the individual defendants, excluding Charity Hospital and the State of Louisiana. The district court also reduced the jury's award of 3.2 million dollars to $500,000 pursuant to the limitation of liability contained in R.S. 40:1299.39, which limitation the court specifically held to be constitutional.
On appeal, plaintiff contends that the trial court erred in finding the statute to be constitutional and in failing to find any liability on the part of Charity Hospital or the State of Louisiana. Defendants have cross-appealed contending that the jury's finding of negligence on the part of Dr. Greenfield, Dr. Smith and SRNA Reyes is manifestly erroneous; that Cathy Hampton's own negligence was the sole cause of her injuries; that the $500,000 liability cap is constitutional; and in the alternative, that the amount of damages determined by the jury is excessive.
The facts of the case are as follows:
Cathy Hampton, a thirty-three year old nursing assistant, went to the Charity Hospital Emergency Room on February 4, 1986, complaining of shortness of breath and hyperventilating. She was admitted and given oxygen by face mask, but continued to hyperventilate for more then twelve hours. She was eventually diagnosed as suffering from Adult Respiratory Distress System and was placed in the Medical Intensive Care Unit (MICU).
The day after her admission, Ms. Hampton was nasally intubated (an endotracheal *632 tube was introduced into her windpipe and attached to a mechanical ventilator) to improve her oxygenation. That afternoon, Ms. Hampton pulled the tube out of her trachea. She was reintubated orally, and her hands were physically restrained. The resident physicians, Dr. Holly Greenfield and Dr. Charles Smith, then explained to Ms. Hampton the importance of the endotracheal tube. After the patient acknowledged that she understood, the restraints were removed.
Ms. Hampton's condition slowly improved until February 8, 1986 at approximately 3:00 a.m., when the nurse on duty discovered that her tube had again been pulled out. The nurse immediately summoned Dr. Greenfield and Dr. Smith, who were on call. When the residents arrived, Ms. Hampton was sitting up in bed, hyperventilating, and stating that she wanted to go home and be treated as an outpatient. The doctors placed an oxygen mask on her and called the Anesthesia Department to have her reintubated. The case was handled as a "code" or emergency.
Three to five minutes later, SRNA Marcus Reyes arrived to perform the reintubation. Mr. Reyes at the time was a student nurse anesthetist who was in his eighth month of a twenty-seven month program to become a Certified Registered Nurse Anesthetist. Charity Hospital had a written policy allowing SRNA's in their first year to respond to code calls with the supervision of a CRNA. Mr. Reyes was not accompanied by a CRNA when he arrived at Ms. Hampton's bedside.
Mr. Reyes administered morphine and placed Ms. Hampton on her back to facilitate the reintubation. At this time, she was barely breathing. Mr. Reyes' first attempt resulted in the intubation of the esophagus rather than the trachea. He removed the tube and ventilated the patient's lungs with an "Ambu-bag." He tried again, and again intubated the esophagus. Ms. Hampton's heart rate slowed, and Mr. Reyes again "bagged" her with 100% oxygen. At this point Ms. Hampton went into cardiac arrest. Drs. Smith and Greenfield began cardiopulmonary resuscitation. Mr. Reyes successfully intubated the patient on his third attempt.
Although her vital signs returned following the cardiopulmory resuscitation, Ms. Hampton did not immediately regain consciousness, but slipped into a coma for seven days. After she came out of the coma, her condition improved steadily. On March 17, 1986, she was moved to the Louisiana Rehabilitation Institute at Charity, at which time she exhibited slow, dysphasic speech, mild spasticity/rigidity in all extremities, generalized weakness and incoordination, with some muscle spasms and twitches. She was ambulatory with assistance. On April 17, she was discharged from the rehabilitation clinic to go home.
This lawsuit was brought by Cathy Hampton's mother on behalf of Cathy and Cathy's thirteen-yeard-old daughter, Tanaka. The case was tried by a jury with respect to the individual defendants and by the trial judge with respect to the State. The jury found Marcus Reyes, Dr. Holly Greenfield, and Dr. Charles Smith to be guilty of negligence causing the plaintiff's injuries in degrees of 80%, 10%, and 10% respectively. The jury also determined that Cathy Hampton was not guilty of any negligence contributing to her own injuries. Finally, the jury set damages in the amount of $50,000 for future medical and related benefits, $150,000 to Tanaka Hampton for the loss of the service and society of her mother, and $3,000,000 in "other damages."
Regarding the case against the State, the trial judge found that Charity's policy of allowing SRNA's to respond to emergency calls was beneath the standard of care appropriate for this community. Nevertheless, the trial judge also found that Charity's negligence in sending nurse Reyes on this call was not a cause in fact of the plaintiff's injuries. He based this conclusion on his determination as independent fact-finder that Mr. Reyes' conduct itself was not below the standard of care that would be expected of a full-fledged Certified Registered Nurse Anesthetist. In his Reasons for Judgment, the trial judge stated:

*633 It is also clear from the record that it is not uncommon for a fully qualified Certified Registered Nurse Anesthetist to need more than one attempt to successfully orally intubate an awake patient. The important thing is to recognize the error, and to ventilate the lungs between attempts.
The trial judge therefore concluded that because Mr. Reyes acted appropriately, Charity's act of sending an SRNA to respond to this call was not a legal cause of Ms. Hampton's cardiac arrest.
In addition to exonerating the state, the trial judge also held that the $500,000 liability cap in R.S. 40:1299.39 was constitutional, citing Sibley v. Board of Supervisors of Louisiana, 477 So.2d 1094 (La.1985). He then rendered judgment in favor of the State and Charity Hospital against the plaintiff, and in favor of the plaintiff against Drs. Holly Greenfield and Charles Smith, and Marcus Reyes, in the percentages of fault assigned by the jury, for the amount of $500,000 with interest. The judge found it unneccessary to reconcile the conflict between his finding that Mr. Reyes was not negligent and the jury's finding that Mr. Reyes' negligence constituted 80% of the fault that caused plaintiff's injuries. He cited Aubert v. Charity Hospital of Louisiana, 363 So.2d 1223, 1226 (La.App. 4th Cir.1978), writ denied, 365 So.2d 242 (La.1978) in which this court held that where a trial judge and a jury each have the authority to find facts necessary to determine the liability of particular defendants in a single trial, the judge has the duty to make independent factual findings based on his appreciation of the evidence in the judge trial, even if these findings are inconsistent with those made by the jury.
In Supplemental Reasons for Judgment, the trial judge noted that under R.S. 40:1299.39 as it existed in February of 1986, Tanaka Hampton would not have a claim separately from her mother; therefore the $150,000 awarded to her by the jury is included in the total amount subject to the $500,000 limitation. The judgment also specifically declared the limitation to be constitutional. Finally, the trial judge struck the $50,000 monetary limitation placed on future medical expenses by the jury, stating that although future medical care is definitely warranted, it should be recovered under the procedure set forth in the statute, with no limit as to amount.
On appeal, we are faced with several issues, including: (1) Whether the trial judge committed manifest error in finding no liability on the part of the State; (2) Whether the jury committed manifest error in determining the liability of the individual defendants; (3) Whether the $500,000 cap on liability applies and whether it is constitutional; and finally, (4) Whether the damages awarded by the jury are excessive. We will discuss each issue in turn.
Liability of the State
Uncontradicted expert testimony at the trial clearly established that Charity's policy allowing SRNA Reyes to respond to this code call was a breach of the applicable standard of care, as the trial judge held. However, plaintiff argues that the trial judge erred in further holding that this breach of duty was not a cause-in-fact of plaintiff's injuries. We agree with plaintiff that the trial judge's conclusion as to causation is based upon improper legal analysis and is clearly wrong.
Once a breach of duty is established, the question becomes whether defendant's conduct increased the risk of harm to plaintiff to the extent of being a substantial factor in causing plaintiff's injury. Tabor v. Doctors Memorial Hospital, 563 So.2d 233, 238 (La.1990). A substantial factor need not be the only causative factor; it need only increase the risk of harm. Hastings v. Baton Rouge General Hospital, 498 So.2d 713, 720 (La.1986). In medical malpractice actions, the plaintiff need not prove that the patient would have survived if proper treatment had been given, but only that there would have been a chance of survival. Tabor, supra.
In the instant case, to carry its burden on causation, the plaintiff must show that Ms. Hampton probably would not have suffered cardiac arrest but for Charity's policy. See Shelton v. Aetna Casualty & Surety Company, *634 334 So.2d 406, 409 (La.1976). The trial judge determined that Charity's policy was not a legal cause of the cardiac arrest because SRNA Reyes was not negligent; that is, he recognized the esophagal intubations and responded appropriately to correct them. This analysis completely misses the point. The question is not whether Mr. Reyes was negligent, but whether the cardiac arrest would probably have been avoided if Charity had sent a Certified Registered Nurse Anesthetist rather than Mr. Reyes to perform the intubation.
Two medical experts testified that Mr. Reyes lacked the degree of knowledge, skill and experience necessary to respond to this code call. Mr. Reyes was in his eighth month of a 27-month program to become a CRNA. His CRNA supervisor testified that although first-year SRNA's were not normally assigned to the night shift, an exception was made in Mr. Reyes' case because he had spent nine months in a nursing masters program in another state before coming to Charity. The supervisor did not remember whether Mr. Reyes notified her before responding to the code call, as is required by Charity's written policy, but said it would not have been necessary for him to do so.
Defendants emphasize that intubation is a skill taught in the first few months of Charity's CRNA course. The fact that Mr. Reyes had been taught the technique of intubation, however, does not negate the fact that a more experienced intubator probably would have performed better. Although Mr. Reyes had done approximately 200 intubations, this case was his first attempt to orally intubate an awake patient. When asked whether it was unusual for someone attempting an oral intubation to intubate the esophagus, Dr. Samuel Wellborn, an anesthesiologist, stated that it was not unusual "for a beginner" to do so, although even experienced intubators such as himself do it "occasionally". The crux of this matter is that a first-year SRNA, such as Mr. Reyes, is a "beginner."
Testimony established that Ms. Hampton's cardiac arrest most likely resulted from hypoxia, a lack of oxygen. We find that Charity substantially contributed to Ms. Hampton's hypoxia by sending SRNA Reyes, who failed to intubate her properly on the first two attempts in an emergency situation. It is more likely than not that a more experienced CRNA would not have required the same delay to intubate Ms. Hampton properly, and had she been intubated sooner, she probably would not have suffered cardiac arrest. We therefore find the trial judge's conclusion that Charity's negligence was not a cause-in-fact of the plaintiff's injuries to be manifestly erroneous. Accordingly, we reverse the portion of the judgment exonerating Charity Hospital and the State of Louisiana, and find in favor of the plaintiff with respect to these two defendants.
Liability of the Individual Defendants
Defendants argue that the trial court erred in finding Drs. Greenfield and Smith and SRNA Reyes to be guilty of negligence that substantially contributed to the plaintiff's injuries. After reviewing the record, we find the jury's conclusions to be reasonable based upon the evidence presented.
Mr. Reyes, who was found to be 80% at fault, did not remember notifying his supervisor before responding to the code call, as was required by Charity's written policy for SRNA's. Two experts in anesthesiology testified that Mr. Reyes simply lacked the degree of knowledge, skill and experience necessary to perform adequately in this situation. Their opinion was contradicted only by Mr. Reyes' CRNA supervisor, who believed he was qualified. Finally, Mr. Reyes intubated the esophagus twice, and the patient suffered cardiac arrest before he was able to properly intubate her.
With regard to Drs. Greenfield and Smith, there was expert testimony to the effect that they should have used an "Ambu-bag" on Ms. Hampton rather than an oxygen mask while waiting for Mr. Reyes to arrive. Another physician expert indicated that Drs. Greenfield and Smith should have attempted to reintubate Ms. Hampton themselves rather than waiting for the Anesthesia Department. Although *635 this testimony was not uncontradicted, it was sufficient evidence upon which the jury could reasonably have concluded that these doctors were each 10% at fault in bringing about Ms. Hampton's injuries.
Accordingly, we find no manifest error in the trial court's judgment holding these individual defendants liable to plaintiff.

Applicability of the Statutory Cap on Liability
Having found the State liable to plaintiff, we must now determine whether the $500,000 liability limitation found in R.S. 40:1299.39 applies to the State in this instance.
In February of 1986, when the plaintiff's injury occurred, the limitation of liability in R.S. 40:1299.39, termed the Public Medical Malpractice Statute, applied only to stateemployed physicians and other professionals providing medical and related health care services. The Louisiana Supreme Court specifically held that the liability cap did not apply to judgments rendered against the State itself. Sibley v. Board of Supervisors of Louisiana State University, 477 So.2d 1094, 1104 (La.1985). In 1988, the legislature amended the statute to include in the definition of "person covered by this Part," the State and any of its departments, specifically including state hospitals. See 1988 La. Acts. No. 786. Defendants contend that this amendment should be applied retroactively to limit plaintiff's recovery against the State and Charity Hospital. We disagree.
A law may be applied retroactively only if it is procedural or remedial in nature rather than substantive, and then only if the retroactive application does not disturb vested rights. Graham v. Sequoya Corporation, 478 So.2d 1223 (La.1985). In this case, defendants argue that the limitation on liability in the Public Medical Malpractice Act should be applied retroactively based upon this court's holding in Mullet v. State Department of Transportation and Development, 539 So.2d 897, 907 (La.App. 4th Cir.1989), writ denied, 541 So.2d 1390 (La.1989). In Mullet, we held that R.S. 13:5106(B)(1), which limits to $500,000 the amount of general damages recoverable in a personal injury suit against the State, could be applied retroactively without disturbing vested rights. Defendants urge that Mullet is analogous to the instant case because this case also involves a limitation on the amount of damages recoverable and because in this case, as in Mullet, the injury occurred before the statute became effective but the judgment was obtained afterward.
Despite these similarities, defendants reliance on Mullet is misplaced. R.S. 13:5106(B)(1), the statute applied in Mullet, differs from the liability limitation in the Public Medical Malpractice Act in an important respect. 13:5106(B)(1) places a $500,000 limitation on the amount of general damages only, specifically excluding medical care and related benefits, loss of earnings and loss of future earnings. Conversely, the limitation found in R.S. 40:1299.39(F) applies to all items of damages except "future medical care and related benefits valued in excess of ... five hundred thousand dollars."[1] This limitation therefore includes not only general damages, but also some types of special damages, specifically past and future lost wages.[2] The inclusion of special damages clearly distinguishes the statutory limitation of 40:1299.39 from the one involved in Mullet, because the recovery of certain items of special damages may be considered a vested right.
More on point is Marcel v. Louisiana State Department of Public Health, 492 So.2d 103 (La.App. 1st Cir.1986), writ denied, 494 So.2d 334 (La.1986), in which the First Circuit held that R.S. 40:1299.39 could not be applied retroactively to limit the amount of recovery by a plaintiff whose *636 cause of action arose before July 2, 1976, the effective date of the statute. The court stated that the legislature never intended for the Public Medical Malpractice Act to be applied retroactively because to do so would disturb pre-existing vested rights. Marcel, 492 So.2d at 110. As in the instant case, the plaintiff in Marcel was injured before the statute became effective, but didn't obtain a judgment until after the effective date.[3]
We agree with the First Circuit that the retroactive application of R.S. 40:1299.39 would disturb vested rights. Under the same reasoning, we decline to apply retroactively the amended version of the statute in the instant case. Therefore, we hold that the $500,000 limitation does not apply to damages recoverable by plaintiff against the State.
Because the State is responsible for the entire amount of plaintiff's damages, we need not discuss the issue of whether the $500,000 limitation in R.S. 40:1299.39 is constitutional. This issue is moot.

QUANTUM
Defendants argue that the jury abused its discretion in determining the amount of damages. After reviewing the particular facts of this case, we agree that the amount of damages determined by the jury is so excessive that it constitutes an abuse of discretion. See Reck v. Stevens, 373 So.2d 498 (La.1979).
The jury awarded $3,000,000 in damages to Ms. Hampton, plus $150,000 to her daughter Tanaka Hampton for the loss of the care and society of her mother. We find no abuse of discretion in the award to Tanaka Hampton. However, there is no basis in the record for an award of $3,000,000.
Ms. Hampton was in a coma for seven days. When she emerged, she spent approximately one month improving in the hospital and another month at the rehabilitation clinic. When she entered the rehabilitation clinic, she had problems with slow speech, general weakness and incoordination, and mild spasticity/rigidity in all her extermities. However, her comprehension and memory were noted to be good, and she could walk with assistance.
Upon discharge from the rehabilitation clinic, she continued to exhibit rigidity in all movements with particular difficulty in isolated finger extensions. She could perform many fine motor skills if done slowly. She stated that she was able to get around her house without any difficulty. When she left the hospital, she returned to her apartment to live with her daughter Tanaka and her boyfriend for about a month. She participated sporadically in a weekly stroke clinic and was discharged on December 12, 1986, at which time she was noted to have good balance in standing, sitting and walking without assistance.
Ms. Hampton's mother, Josie Hampton, testified that Cathy moved back in with her after she became pregnant again. She appeared at Charity Hospital for prenatal care on February 27, 1987, at which time she was about 33 weeks pregnant. Because of her medical history, a neurological examination was performed during Ms. Hampton's pregnancy. Dr. Summers, her treating physician during the pregnancy, testified that this exam showed no neurological deficits and that she required no special care because of her preexisting condiction. Dr. Summers testified that except for her speech being a little bit slow, he did not notice anything unusual about Ms. Hampton and he had no difficulty speaking with her.
Ms. Hampton was also examined by three neurologists for purposes of the trial. Dr. Leon Weisberg, who testified for the plaintiff, examined Ms. Hampton in July of 1987 and again in July, 1988. His first examination revealed that Ms. Hampton had an "organic memory disturbance" and an "incoordination which interfered with her ability to stand or walk," both due to hypoxia. A year later, Dr. Weisberg found that Ms. Hampton's condition had improved, *637 but that there was still some evidence of memory loss, and a balance impairment he felt was permanent. Because of these problems, Dr. Weisberg believed that Ms. Hampton was unable to work as a nurse's aide at that time. He also believed that Ms. Hampton would need supervision in performing certain activities, such as cooking and paying bills.
Dr. William Martin, plaintiff's other expert in neurology, stated that one of Ms. Hampton's residual problems was a cognitive deficit; she scored 69 on an I.Q. test, which is in the mild mental retardation range. He also found her to have poor coordination, jerking movements which became more severe when she was fatigued, and slurred speech, but no difficulty understanding speech or expressing her thoughts. She also had a normal gait.
Dr. Patricia Cook, who examined Ms. Hampton at the request of defendants, concluded that she had only mild neurological abnormalities, including a slight unsteadiness in her gait, a slight degree of weakness and a slight scanning of her speech. On a scale of 1 to 10, Dr. Cook rated Ms. Hampton's neurological deficits as a "2". It was Dr. Cook's opinion that Ms. Hampton could be rehabilitated to return to some type of gainful employment.
With regard to Ms. Hampton's loss of employment, economist Melvin Wolfson testified that her past lost wages equaled $24,700, and estimated the present value of her future lost wages to be $197,363.00. This figure was based upon the assumption that Ms. Hampton will never again be gainfully employed. Dr. Wolfson also calculated the expense of employing a sitter to care for Ms. Hampton, and testified that it would cost $298,721 to employ a sitter at $4.75 an hour for eight hours per day five days a week for the remainder of her life. That figure would double to $597,442 if Ms. Hampton needed a sitter sixteen hours per day.
Considering all the evidence in the light most favorable to the plaintiff, we do not find any reasonable basis for the jury's award of three million dollars in damages. Although she is somewhat impaired mentally and physically, Ms. Hampton is obviously a functioning individual who can basically care for herself (i.e., feed, bathe and dress herself) and communicate with others, although she may need supervision in doing certain tasks, such as cooking and handling her finances. Although both her mother and one of the neurologists testified that she needed such supervision, plaintiff presented no proof that Ms. Hampton needed a sitter for any substantial period of time, such as eight hours per day. There was no testimony that she could not be left alone as long as she did not attempt to perform any of the aforementioned tasks. Concerning her ability to work, the experts differed as to whether Ms. Hampton could resume some type of employment in the future.
When, as here, the amount of damages awarded by the trial court is so excessive as to constitute an abuse of discretion, the appellate court may disturb the award only to the extent of lowering it to the highest point which is reasonably within the discretion afforded the trial court. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977). Viewing the evidence in light of this maxim, we find it necessary to reduce the total award of $3,200,000 determined by the jury to $1,500,000. This sum is intended to include $150,000 to Tanaka Hampton; $200,000 in loss of earnings, which assumes Ms. Hampton will never work again; $150,000 for the expenses of a sitter four hours per day five days per week (to help in performing those necessary tasks in which she needs supervision), and $1,000,000 in general damages for pain and suffering.

CONCLUSION
For the reasons given above, we reverse the trial court's finding of no liability on the part of the State of Louisiana and Charity Hospital; we also reverse that portion of the judgment applying the $500,000 limitation of R.S. 40:1299.39; we affirm the judgment against the individual defendants but modify the award, and also affirm the trial court's finding that Ms. Hampton is in need of future medical care of an unspecified *638 amount. Accordingly, we issue judgment in favor of plaintiff and against the State of Louisiana, Department of Health and Resources; Charity Hospital; Holly F. Greenfield, M.D.; Charles Smith, M.D.; and Marcus Reyes in the amount of $1,500,000 plus interest and costs.
REVERSED IN PART; MODIFIED AND AFFIRMED IN PART.
NOTES
[1] The statutory definition of "future medical care and related benefits" includes medical care required from the date of the injury to the date of the judgment, as well as afterward. See R.S. 40:1299.39(A)(7).
[2] In the instant case, although there was evidence presented regarding Ms. Hamtpon's past and future loss of earnings, the jury was not asked to specify what portion of the damage award represented these special items.
[3] In Marcel, because the damages were not initially discoverable, the suit was not filed until July 29, 1982, more than six years after the Public Medical Malpractice Act took effect. 492 So.2d at 105.