492 So.2d 103 (1986)
David MARCEL, as Administrator of the Estate of his Minor Child, Dena Marcel
v.
LOUISIANA STATE DEPARTMENT OF PUBLIC HEALTH (DEPARTMENT OF HEALTH & HUMAN RESOURCES), State of Louisiana, Dr. J. Milo Aitkens, XYZ Insurance Company and ABC Insurance Company.
No. CA 85 0497.
Court of Appeal of Louisiana, First Circuit.
June 24, 1986.
Writ Denied October 3, 1986.
*104 Charles Hanemann, Houma, for plaintiff and appellee David Marcel.
Dale P. Martin, Morgan City, for defendants and appellants Dept. of Health & Human Resources and State of La.
Paul D. White Jr., Alexandria, for defendant J. Milo Aitkens, M.D.
Before CARTER, SAVOIE and ALFORD, JJ.
ALFORD, Judge.
Defendants appeal the trial court judgment in favor of plaintiff, David Marcel, awarding him $1,303,936.57, together with legal interest and costs, as administrator of the estate of his minor child, Dena, for damages caused by the defendants' failure to diagnose a genetic disorder known as phenylketonuria (PKU) in Dena as an infant.
Appellants are the Louisiana State Department of Health (now the Department of Health and Human Resources and hereinafter referred to as DHHR) and the State of Louisiana (State).[1]

BACKGROUND
Dena was born on August 18, 1975. Pursuant to DHHR and State requirements, her physician collected a blood sample from Dena on August 27, 1975, and forwarded it to DHHR's diagnostic laboratory to be screened for PKU by a Guthrie test. On September 3, 1975, DHHR reported to Dena's physician that the initial test was positive, with a 12 mg % reading. As prescribed by state regulations and guidelines issued by DHHR, Dena's doctor collected blood for a second Guthrie test for PKU on September 4, 1975, and forwarded it to DHHR. DHHR reported the results of this test as negative on September 9, 1975, and instructed Dena's doctor to perform a ferric chloride urine test. Dena's physician complied, and the results were reported as negative on October 21, 1975. No further action was taken. DHHR failed to followup *105 and request the two additional ferric chloride tests called for by its own requirements and closed its file on Dena without the required report.
Dena's doctor continued to treat her for various ailments through September 29, 1976. After that time, Dena was treated repeatedly for various complaints by several other physicians, none of whom suspected that Dena had PKU. As an infant and toddler, Dena experienced developmental delays in regard to sitting, walking and talking and had recurrent skin problems. In the spring of 1981, Dena's mother noticed that Dena was experiencing staring episodes. On July 1, 1981, Dena was referred to Dr. M. Caroline Duncan, a pediatrician and pediatric neurologist at LSU School of Medicine. After examining Dena, Dr. Duncan mentioned PKU as one of several possibilities and had a screening test run for PKU on blood samples taken from Dena. Test results from this test and subsequent tests showed that Dena had an elevated phenylalanine level. In late July, Dr. Duncan referred Dena to Dr. Emmanuel Shapira, a physician and professor of pediatrics, pathology and biochemistry at Tulane Medical School. After examining Dena on July 23, 1981, Dr. Shapira informed the Marcels that he considered PKU a possibility and suggested that she be admitted to the hospital for definitive testing. He placed Dena on a phenylalanine restricted diet for testing purposes prior to her hospitalization on August 5, 1981. He withheld specific diagnosis until protein loading tests were performed in the hospital, since a high phenylalanine count could indicate conditions other than PKU. On August 8, 1981, Dr. Shapira told Dena's parents for the first time that the test results were indicative of PKU. By letters of August 14 and August 25, 1981, he confirmed the PKU diagnosis.
Because of the PKU, Dena is mentally retarded in the moderate range. More likely than not, her IQ will continue to fall. She attends a special education class, her physical development is impaired and she is subject to seizures which must be controlled by medication. Had Dena's PKU been diagnosed as an infant and had Dena been started on a phenylalanine restricted diet within the first few months of life, she would not have suffered the above described defects.
Plaintiff filed the instant negligence suit on July 29, 1982. Defendants answered, denying any negligence and filed an exception of prescription and/or peremption. The trial court, after hearing the evidence and reviewing the depositions entered into evidence, determined that the plaintiff's cause of action had not prescribed and found defendants negligent for failure "to establish and implement an effective program for identifying PKU," for failure to follow up on positive test, for failure to initiate treatment, for failure to conduct the second Guthrie test properly, and for failure "to adhere even to its own ineffective Guidelines and Procedures." The court held that the defendants' negligence was the direct cause-in-fact of Dena's permanent and irreversible mental retardation with the accompanying physical disorders and awarded plaintiff $1,000,000 in general damages and $303,936.57 for economic loss. We agree and affirm.

PRESCRIPTION
Defendants appeal, alleging the trial court erred in denying their exception of prescription and/or peremption. In support of this allegation, defendants claim that LSA-R.S. 9:5628, which became effective on September 12, 1975, applies to the instant case. The trial court concluded that DHHR and the State are not parties protected by the three-year liberative prescription of LSA-R.S. 9:5628. We agree.
LSA-R.S. 9:5628 provides:
A. No action for damages for injury or death against any physician, chiropractor, dentist, or hospital duly licensed under the laws of this state, whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought unless filed within one year from the date of the alleged act, omission or neglect, or within *106 one year from the date of discovery of the alleged act, omission or neglect; provided, however, that even as to claims filed within one year from the date of such discovery, in all events such claims must be filed at the latest within a period of three years from the date of the alleged act, omission or neglect. (Emphasis ours)
This statute applies only to actions against the entities listed above. It is apparent that the DHHR, its diagnostic laboratory that performed the Guthrie tests on Dena in 1975, and the State are not physicians, chiropractors or dentists. The defendants also do not qualify as a "hospital" for malpractice purposes as defined by LSA-R.S. 40:1299.41.A(4) or LSA-R.S. 40:2102. Defendants' contention that the diagnostic laboratory is a physician's clinic within the meaning of LSA-R.S. 40:1299.41.A(4) is without merit.[2] Thus, by its own terms, LSA-R.S. 9:5628 is inapplicable to the instant case, and any discussion of when the three-year prescriptive period should start to run or of whether or not the statute should be retroactively applied is pretermitted.
The trial court determined that the liberative prescription applicable to the case at bar is the one-year prescriptive period for delictual actions, La.Civ.Code art. 3492 (formerly La.Civ.Code arts. 3536 and 3537), and that prescription had not run. We agree. The one-year liberative prescription commences "to run from the date the injured party discovered or should have discovered the existence of facts that would entitle him to bring suit." Lott v. Haley, 370 So.2d 521, 523 (La.1979). One-year prescription in regard to plaintiff's cause of action for misdiagnosis and/or failure to properly treat begins to run on the date plaintiff discovers the cause of his condition. Chaney v. State Through Dept. of Health, 432 So.2d 256 (La.1983).
Plaintiff brought the instant suit on July 29, 1982. The misdiagnosis occurred in September and October of 1975, when the State's diagnostic laboratory reported Dena's second Guthrie screen as negative and then improperly closed the case file. While the possibility of a misdiagnosis was raised by Dr. Duncan and Dr. Shapira before the end of July, 1981 (they both indicated to the Marcels that PKU was one of several possibilities), the Marcels did not discover the cause of Dena's condition until August 8, 1981, at which time Dr. Shapira informed them that the test results were indicative of PKU. Therefore, we concur with the trial court's finding that "(i)t was not until August of 1981 that the parents knew or had reason to know that their child had PKU."

LIABILITY
Defendants also allege that the trial court erred in finding the defendants both directly and vicariously liable.
PKU is a genetic disorder, which if undiscovered and untreated within the first year of life, causes mental retardation and a wide range of other mental and physical abnormalities. If diagnosed and treated through a controlled diet early enough, the victim can live normally. In order to detect this disorder, medical science has developed screens of varying degrees of accuracy along with diagnostic tests of greater accuracy.
The legislature enacted a statute concerning PKU, LSA-R.S. 40:1299, which in 1975 directed the State, through the DHHR, "to establish, maintain and carry out a program designed to combat mental retardation in children suffering from ... phenylketonuria." DHHR was authorized to adopt rules and regulations to carry out the program and to establish and maintain a diagnostic laboratory for the early detection of PKU. The legislature also enacted *107 LSA-R.S. 40:1299.1 which provided that the attending physician shall cause a newborn child to be subjected to a PKU test approved by DHHR, that the DHHR "shall follow up all positive tests with the attending physician," and that, when confirmed, DHHR and other state agencies shall "provide for the continued medical care, dietary and other related needs of such children, where necessary or desirable." Thus, the State through DHHR has the duty to potential PKU victims to establish said programs and tests using reasonable care and diligence in view of medically recognized standards.
DHHR procedures in place at the time Dena was born provided for a Guthrie test to be run on all newborns and, if the initial screening test showed a serum phenylalanine level of 6-12 mg%, a second Guthrie test was to be done, along with three ferric chloride tests on the baby's urine after the child was three weeks old. If the second Guthrie test and the three urine tests were negative, the case could be closed. If the second Guthrie test was positive, a more definitive flurometric assay was to be run. A stricter requirement was to be followed if the initial screening test showed a serum phenylalanine level of 12-20 mg% in that a diagnostic test was to be done immediately. DHHR notified Dena's doctor that her initial serum phenylalanine test showed 12 mg% and forwarded to him a letter and a set of guidelines for retesting Dena. The letter and the guidelines referred to retesting for initial phenylalanine levels "from 4 to 12 mg%" and "over 12%" and "above 12 mg%." The letter and guidelines also indicated that a ferric chloride test should be run on a urine sample.
DHHR's procedures required three urine tests to be run if the initial Guthrie was positive, whereas the guidelines received by the pediatrician speak of a urine test in the singular only. As noted by the trial court:
The pediatrician will therefore be led falsely to conclude that one ferric chloride test is sufficient, not the three called for by the Procedures. Dr. Aitkens' records indicate indeed only one ferric chloride test, and not the three required by the Procedures.
Moreover, both the procedures and guidelines were ambiguous in their treatment of an initial phenylalanine level of 12 mg%, as Dena's was. This ambiguity allowed the looser procedure to be used in Dena's case. The State suggested and Dena's pediatrician followed the procedure for 6-12 mg% rather than for 12-20 mg%, the result being that Dena's PKU was misdiagnosed.
As to the adequacy of the testing procedures in general, Dr. Duncan testified that the follow-up was not sufficient. She advised that the use of ferric chloride tests as a follow-up to a negative second Guthrie test was inadequate. Both Dr. Shapira and Dr. Robert Guthrie, the physician who developed the Guthrie screening test, testified in their depositions that ferric chloride tests on urine were unreliable as screening tests when compared with more reliable and accurate blood tests available at the time of Dena's birth. The three experts agreed that after the second Guthrie screening test showed a negative, they would have performed a third Guthrie, at least. Moreover, Dr. Shapira stated that after an initial positive screening test, as was found in Dena's case, a more definitive quantitative test should have been run.
The trial court found defendants "negligent in establishing and maintaining a substandard PKU program," concluding that the procedures and guidelines set forth by DHHR were inconsistent and ambiguous and that these inconsistencies and ambiguities allowed Dena's PKU to be misdiagnosed. We agree with the trial court that the State, through DHHR, failed to meet its duty to use reasonable care and diligence in developing the PKU program.
Relying on circumstantial evidence, the trial court also found that DHHR's diagnostic laboratory incorrectly performed the second Guthrie test on Dena's blood, resulting in a false negative finding. The trial court stressed the importance of the improperly run test, stating:
Had the second Guthrie test shown positive, as it had to in Dena's case if properly *108 administered, the mechanism established, in the State's Procedures and Guidelines would hopefully have gone into action, generating further follow-up. It did not happen.
We agree, thereby finding the State and DHHR vicariously liable for the negligence of DHHR's laboratory personnel who received the samples of Dena's blood and ran the Guthrie test.
A party relying upon circumstantial evidence has borne his burden of proof only if the evidence, taken as a whole, shows that the defendant's fault was the most plausible cause of injury and no other factor can as reasonably be ascribed as the cause. Blanchard v. Sotile, 394 So.2d 633 (La.App. 1st Cir.1980), writ denied, 399 So.2d 601 (La.1981).
Dr. Guthrie testified in his deposition that "there was undoubtedly an error committed in the second laboratory test." He stated that there is no way the second blood specimen taken from a child later determined to have PKU would have a lower level of phenylalanine than the initial sample. Dr. Guthrie emphasized that after the first week of birth, the chance of a false negative from a properly executed Guthrie test vanishes. Dr. Duncan agreed that the most likely cause of the false negative report would be error in the testing procedure at the laboratory, unless the child was on a protein free diet or unless there was error in the collection of the blood.
Dena's doctor testified that he withdrew blood from Dena and mailed it to the State's laboratory in New Orleans. He stated he knew the blood was Dena's because he did the blood test personally. He put the sample in an envelope and gave it to his secretary to mail. There was no testimony to support defendants' speculation that Dena's physician might have handled the sample improperly. In regard to Dena being on a protein restrictive diet at the time the test was run, her physician and her mother testified that she was on infant formula at the time. Such a formula would not lower the phenylalanine levels in the blood of a PKU child. Additionally, Dr. Shapira stated in his deposition that, even if a PKU child was not taking in any protein, the phenylalanine level in the blood would not be reduced. The phenylalanine level is only reduced by a special controlled diet.
Thus the trial court's determination that an error in the testing or reporting procedure at the State's laboratory was the most plausible cause of the false negative test report is supported by the record.
We note that the defendant did not appeal the trial court's finding of vicarious liability on the part of the State because a clerk with DHHR failed to follow the procedures in effect at the time and prematurely closed Dena's file.

QUANTUM
Defendants contend that the trial court abused its much discretion by rendering a $1,000,000 general damages award. They do not complain about the $303,936.57 award for economic loss based on $2,873.79 for past medical bills, $135,126.59 for lost future earnings and $165,936.19 for future psychiatric and psychological care and for foster care after age 18.
The trier of fact has much discretion in the assessment of damage awards. La.Civ. Code art. 1934 (3) (1984). Before an appellate court can disturb a trial court award, the record must clearly reveal an abuse of this discretion. Anthony v. Hospital Service Dist. No. 1, 477 So.2d 1180 (La.App. 1st Cir.1985), writ denied, 480 So.2d 743 (La.1986). In order to determine if there has been an abuse of the trier of fact's much discretion, there must be an articulated analysis of the facts of the individual case, looking at whether the award for the particular injuries and their effects upon this particular injured person is a clear abuse. Reck v. Stevens, 373 So.2d 498 (La.1979).
The record in the instant case reflects the seriousness of Dena's mental retardation and physical disabilities. The trial court stated:
Dena's chances for a normal life have been obliterated, and she is condemned to live on a sub-human level.

*109 Unrecognized and untreated PKU has resulted in such pronounced retardation that Dena's IQ is only 48. Her intellectual development is close to its maximum. No significant improvement in her intellectual development is likely....
Her low IQ will prevent Dena from ever progressing beyond special education. She will never be self-sufficient enough to live alone. If she can ever find employment, it will only be token employment for the severly handicapped....She will never understand money.
...Dena experiences epileptic seizures. Dena is subject to behavioral problems and psychiatric and psychological disorders ....
PKU makes Dena hyperactive and irritable. PKU has shortened her attention span so much as to make learning and the accomplishment of simple tasks impossible.
PKU has impaired Dena's physical development.... Her coordination and motor control are so affected by PKU that she cannot even jump rope, tie her shoes, or play jacks....
....
...Her chances for marriage, for motherhood and for a satisfying life...have been destroyed.
Perhaps saddest of all is that Dena has been left with just enough intelligence to understand that something is very wrong with her. She can look around and see that her sister and others can do and feel and know and experience things that she cannot.
We find that the award of general damages is not an abuse of the trier of fact's much discretion, considering the serious nature of Dena's disabilities. A review of recent cases dealing with permanent brain damage indicates our finding is in line with recent jurisprudence. See Leray v. St. Paul Fire and Marine, 444 So.2d 1252 (La.App. 1st Cir.1983), writ granted, 448 So.2d 108; case declared moot, remanded 452 So.2d 1174 (La.1984); Naylor v. La. Dept. of Public Highways, 423 So.2d 674 (La.App. 1st Cir.1982, writ denied, 429 So.2d 127, 134 (La.1983); Capone v. King, 467 So.2d 574 (La.App. 5th Cir.1985), writ denied, 468 So.2d 1203, 1205 (La.1985). Therefore, we affirm the award.

LIMITATION OF LIABILITY
Defendants allege that the trial court erred in failing to impose a $500,000 limit on liability pursuant to the provisions of LSA-R.S. 40:1299.39. The statute in question limits malpractice liability for state services. It was intended for immediate application, as evidenced by the fact it was enacted by Acts 1976, No. 66, with the provision that it became effective upon signature by the governor at 7:45 p.m. on July 2, 1976. As noted previously, Dena was born on August 18, 1975. Drs. Duncan, Shapira and Guthrie testified that the damage done by PKU begins shortly after birth with much of the permanent disability occurring in the first year of life. Defendants' acts of negligence occurred in September and October of 1975. Therefore, Dena's cause of action for injuries arose well before the act became effective.
According to La.Civ.Code art. 8, a law can prescribe only for the future and can have no retrospective operation. Moreover, no section of the revised statutes is retroactive unless expressly stated. LSA-R.S. 1:2. Jurisprudentially, the Supreme Court has said that this general rule of prospective application applies only to substantive laws as distinguished from procedural or remedial laws. Lott, 370 So.2d at 523. However, a procedural, remedial or curative law will not be applied retroactively if such retroactivity would operate to disturb vested rights. Graham v. Sequoya Corporation, 478 So.2d 1223 (La.1985). Even in those cases where statutes of limitation have been applied retroactively, the courts have determined that the statute in question must provide a reasonable period after enactment for the filing of suits based upon pre-existing causes of action. Lott, 370 So.2d at 524; Tate v. Rea, 405 So.2d 1200 (La.App. 1st Cir.1981). Where an injury has occurred for which the injured party has a cause of action, such *110 cause of action is a vested property right. Lott, 370 So.2d at 524.
In the instant case, the trial court found LSA-R.S. 40:1299.39 to be substantive in nature. However, even if this statute was not substantive, it is clear that the legislature never intended for the law to be applied retroactively, since to do so would allow pre-existing vested rights (in the case the value of Dena's cause of action) to be disturbed without a reasonable grace period (the statute becoming effective immediately after passage upon governor's signature). Since the statute can have no retrospective operation, it is inapplicable to the instant case and any discussion of whether or not the State and DHHR are "persons" covered by the statute is pretermitted.
For the foregoing reasons, we affirm the judgment of the trial court awarding damages against the defendants in its entirety. Costs of this appeal in the amount of $50.00 are to be borne by the defendants.
AFFIRMED.
NOTES
[1] Although named as defendant in the original suit, Dena's attending physician was dismissed on his unopposed motion for summary judgment. The State and DHHR third-partied this physician, keeping him in the suit. The trial court ruled in his favor on the merits. DHHR and the State did not appeal this ruling, therefore, Dena's attending physician is not before us on appeal.
[2] Webster's Third New International Dictionary (1981) offers the following pertinent definitions of clinic:

3a: an institution connected with a hospital or medical school where diagnosis and treatment are made available to outpatients b: a form of group practice in which several physicians (as specialists) work in cooperative association.