577 So.2d 90 (1990)
Patricia BABIN
v.
BURNSIDE TERMINAL, GREATER BATON ROUGE PORT COMMISSION & State of Louisiana Through the Department of Transportation and Development.
No. CA 89 1808.
Court of Appeal of Louisiana First Circuit.
December 18, 1990.
*92 Robert Kleinpeter, Baton Rouge and Michael H. Schwartzberg, Lake Charles, for plaintiff-appellant, Patricia Babin.
O'Neal Walsh, Baton Rouge, for defendant-appellant, Ormet Corp.
Before LOTTINGER, SHORTESS and CARTER, JJ.
LOTTINGER, Judge.
This is an appeal by the plaintiff and the defendant from a judgment in favor of plaintiff, Patricia Babin, and against defendant, Ormet Corporation (Ormet), for damages arising from a single vehicle accident which occurred on October 22, 1983. The trial court, sitting without a jury, awarded Mrs. Babin general damages of one hundred and fifty thousand dollars ($150,000.00), and special damages of eighty thousand five hundred thirty-two dollars and seven cents ($80,532.07), for a total of two hundred thirty thousand five hundred thirty-two dollars and seven cents ($230,532.07), and apportioned fault at ten percent (10%) to Mrs. Babin, forty percent (40%) to Ormet, and fifty percent (50%) to others.[1]
*93 Ormet appealed suspensively and assigns the following errors:
1. The trial court erred in its use of circumstantial evidence to find that Ormet was responsible for the foreign material on the highway.
2. The trial court erred in finding that Ormet was negligent on any other grounds.
3. The trial court's judgment is not in conformance with its written reasons for judgment.
4. The trial court erred in its apportionment of fault.
5. The trial court erred in failing to consider the doctrine of avoidable consequences when determining quantum.
The plaintiff appealed devolutively and assigns the following error:
1. The trial court abused its discretion in awarding the plaintiff/appellee inadequate damage in the amount of one hundred and fifty thousand dollars ($150,000.00) in general damages.

PROCEDURAL HISTORY
The plaintiff initially filed suit against Burnside Terminal, the Greater Baton Rouge Port Commission (Port Commission), and the State of Louisiana through the Department of Transportation and Development (DOTD). The Ormet Corporation was later added as a defendant by supplemental petition. The Port Commission then filed a third party demand for contractual indemnity against Ormet and its insurer. By a second amended and supplemental petition the plaintiff added International Terminal Operators of La., Inc. (ITO) as a defendant, and by third amended and supplemental petition ITO's insurer was added as a defendant.
Burnside Terminal is merely the name of a facility owned by the Port Commission and leased to Ormet. ITO provided the labor necessary to operate the facility for Ormet at the time of the accident. Since Burnside Terminal is only the name of the facility, and is not a legal entity, it was dismissed from the suit by stipulation of all the parties.
The plaintiff settled with and released the DOTD, and ITO and its insurer, and they were dismissed from the suit. The Port Commission was also dismissed prior to trial pursuant to the plaintiff's motion, and its third party demand was withdrawn. The sole remaining defendant at trial was the Ormet Corporation.

FACTS
The accident underlying this litigation occurred at approximately 6:15 a.m. on the morning of October 22,1983. At that time, the plaintiff, Patricia Babin, was alone in her car and proceeding north on La. 44 in Ascension Parish, also known as River Road. Mr. Greg Periman, a friend of Mrs. Babin, was following her on his motorcycle. It had been raining all night and at the time of the accident a light rain was falling and the sun was not yet up. Mrs. Babin testified that she had her lights and windshield wipers on and was traveling at approximately forty to forty-five miles per hour.
Burnside Terminal is a bulk materials handling facility operated by Ormet. The terminal consists of loading docks on the Mississippi River and overhead enclosed conveyor belts extending across the levee and La. 44 to a storage and weighing area adjacent to the highway. The north gate of Burnside Terminal leads from the storage area across the road from the levee onto La. 44 just south of a curve in the road. As Mrs. Babin went by this gate and entered the curve, she passed over a foreign substance on the road. Mrs. Babin never saw the substance in the roadway.
The foreign substance, together with the wet weather, the curve, and some degree of negligence on Mrs. Babin's part, combined to cause Mrs. Babin to lose control of her car. The car spun out of control and across the roadway, narrowly missing a *94 vehicle heading in the opposite direction. The car then exited the roadway on the left hand side, still spinning out of control, and struck an embankment which forms part of the Mississippi River levee. This caused the car to flip over once and land back on its wheels astride a drainage ditch along the left shoulder of the road.
Mrs. Babin, who was not wearing a seat belt, ended up on the floor between the front and rear seats of the vehicle. When Mrs. Babin attempted to get back into the front seat to get out of the car, she realized from the intense pain in her neck and her inability to hold her head upright, that her neck was broken. With assistance from Mr. Periman and the driver and passengers of the vehicle that she almost collided with, Mrs. Babin managed to get into a prone position in the front passenger seat of the car, which was placed in a fully reclined position for this purpose.
The car was then pushed out of the ditch by Mr. Periman and the others, and Mr. Periman drove it to the emergency room at East Ascension Hospital. After being examined, X-rayed, and immobilized by emergency room personnel, Mrs. Babin was transferred via ambulance to Baton Rouge General Hospital.
Meanwhile, shortly after Mrs. Babin's arrival at the emergency room of East Ascension Hospital, Louisiana State Trooper Robbie Hilburn II arrived at the hospital to investigate the accident. After talking with Mr. Periman, and very briefly with Mrs. Babin, Trooper Hilburn rode out to the scene of the accident with Mr. Periman.
Trooper Hilburn testified that he saw the foreign substance in the road and the marks in the embankment and astride the ditch where the car ran off the road, rolled over, and came to rest. He also testified that because of the rain and traffic in the area that there were no skid marks on the road or tracks through the foreign substance leading to the point where the car left the road, but that the car did leave the road in the area where the material was in the road.
Trooper Hilburn described the foreign substance as a grayish beige material with small white chips of shell or rock in it. He testified that it wasn't soft or gooey but had "some strength to it." He testified that the material was concentrated just north of the Burnside Terminal gate and that it was almost completely in the northbound lane and got fainter the farther away from the gate it was. All of the material was north of the gate, none was south of the gate.
Trooper Hilburn also testified the material was not evenly distributed but was in clumps of about six to eight inches in diameter, and had been flattened by traffic. There was about one clump every square yard at first but they thinned out as they got further away from the gate. He was of the opinion that it had been dropped from an overloaded or partially opened-ended truck. He could not say for sure whether or not the truck had come out of the Burnside Terminal gate because the driveway was shell and approximately the same color as the material in the road and there were no tracks or similar material leading from the driveway onto the road.
Trooper Hilburn did note there was material similar in color to the material on the road in large piles inside the gate some distance back from the road, but he only viewed it from the road and did not examine it closely. He also testified there was a guard shack near the gate but that no one was in it and the gate was open.[2]
The plaintiff's accident reconstruction expert, Mr. Sylvanus Walker, testified, based on the accident report, the depositions of the investigating officer and the plaintiff, *95 and the geography of the accident site, that the farthest away from the gate that the plaintiff could have lost control of her vehicle was about one hundred and forty feet from the gate. He testified, based on his reconstruction of the accident that a speed of forty to forty-five miles-per-hour was consistent with the distance the plaintiff's car slid before rolling over and coming to rest.
He also testified, given the weather conditions at the time of the accident, the plaintiff should have been able to negotiate safely the curve at up to fifty-five miles per hour, but at higher speeds would have a tendency to spin in the curve even absent the foreign material. Accepting the plaintiff's testimony as to her speed of forty to forty-five miles-per-hour, it was his opinion the accident was caused by the loose material present on the roadway near the Burnside Terminal gate.
Mr. Lyndon Williams testified on behalf of Ormet. At the time of the accident he was raw materials manager at the Burnside Terminal. He testified that the Burnside Terminal is a bulk materials handling facility open to the general public, owned by the Baton Rouge Port Commission, and leased to Ormet. He testified that the facility loads, offloads, and stores bulk materials owned by its customers. Ormet does not transport any of the materials it handles and does not own any trucks which could be used for that purpose.
Mr. Williams testified the majority of the material it handles is transferred from ship-to-ship or ship-to-barge or barge-to-ship, and very little of the material, percentage wise, is stored at the storage facility across the road from the river, and even less is transported out of the facility by truck. He testified that although there was no formal written policy with respect to cleaning up the roadway between the dock facilities and the storage area, that if any trucks exiting either the dock area or the storage area spilled or tracked any material onto the roadway, that it would be cleaned up by the operations personnel. Mr. Williams also testified the north gate is usually kept locked and if it was open on the date of the accident, it should not have been.
Mr. Williams testified that at the time of the accident the only material being stored at the storage facility across the road from the levee was a small quantity of coal and two lots, or piles, of barite. The only material moved off of the site by truck during October, 1983, was four truckloads of coal, on October 4, 1983, and 800 tons of limestone, on October 19, 1983, three days prior to the accident.
The limestone was being stored near the dock adjacent to the river. From there it was trucked over the levee and across the road through the main gate into the storage area, where it was weighed before being trucked out through the north gate. This route took the trucks carrying the limestone through the area where the barite was being stored, although it is not clear from the testimony just how close they actually passed to the barite. At twenty tons per truck, it took approximately forty truckloads and twelve hours to move this amount of limestone.
Most of the barite stored at the storage facility during October was moved off the premises by barge via the overhead conveyors on October 6, 1983. Two lots, or piles, of barite totaling 11,000 tons remained in the storage area on the date of the accident. These were the piles of material that Trooper Hilburn apparently saw. Mr. Williams confirmed Trooper Hilburn's testimony that barite is generally the same color as the substance described by Trooper Hilburn as being on the road the morning of the accident.
Mr. Williams testified that in the seventeen years that he has worked at the Burnside Terminal that he has only seen material on the road that had been tracked out by trucks "maybe once or twice, and on those occasions it was mud that had obviously fallen from the tracks of vehicles." When asked by the plaintiff's attorney how one would notify Ormet that material had been tracked onto the road, Mr. Williams testified as follows:
A. We have never been notified. It's been what we have observed. And *96 what usually happens is the foreman on the job, who does a lot of moving back and forth during the day, will observe their materials being tracked. There have been several occasions when an operation has been stopped because they were tracking mud. We have told the customer he can't load his product that day because there's too much mud being tracked out.
Q. We're talking about mud being tracked out of the terminal site itself; correct?
A. That's correct.
Q. Onto La. 44?
A. Yes.

DEFENDANT'S ASSIGNMENT OF ERROR ONE
By this assignment of error Ormet contends that the trial court erred in finding that Ormet was "responsible" for the foreign substance on the road. Ormet argues that the only evidence the foreign substance in the road came from their facility was circumstantial in nature, and that the trial court erred in finding that the foreign substance on the road came from the Ormet facility because other reasonable explanations were not excluded by the plaintiff.
The trial court found that the material on the road came from the Ormet facility. Such a finding is a finding of fact which will not be set aside on appeal unless it is manifestly erroneous. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
The evidence upon which the trial court based its finding was circumstantial in nature. There was no direct evidence that the foreign substance came from the Ormet facility. The trial court had evidence before it as to the proximity of the substance to Ormet's gate and that it was going away from the gate in only one direction, the material appeared to have been dropped from a truck or trucks, the color of the material and that similar colored material was inside the gate, many trucks exited the gate three days before the accident, and trucks had tracked mud onto the road on at least a few occasions in the past.
In civil cases, the burden of proving any fact rests on the party alleging it, and he must prove it by a preponderance of the evidence. Such proof may be by direct or circumstantial evidence. However, when a party relies solely on circumstantial evidence, that evidence must exclude, with a fair amount of certainty, every reasonable explanation for what happened other than the fact sought to be proved. Carter v. City Parish Government of East Baton Rouge, 423 So.2d 1080 (La.1982); Marcel v. Louisiana State Department of Public Health, 492 So.2d 103 (La.App. 1st Cir.), writ denied, (La.1986); Standard Fire Insurance Co. v. Mapes, 408 So.2d 456 (La. App. 1st Cir.1981); Blanchard v. Sotile, 394 So.2d 633 (La.App. 1st Cir.1980), writ denied, 399 So.2d 601 (La.1981); Tillman v. Canal Insurance Co., 305 So.2d 602 (La.App. 1st Cir.1974), writ denied, 307 So.2d 630 (La.1975).
The evidence need not negate every other possible explanation, only all other reasonably probable explanations, otherwise the mere identification in the record of another possible explanation, no matter how improbable, would defeat any claim based upon circumstantial evidence. Carter, 423 So.2d at 1085. The party seeking to prove a particular fact by circumstantial evidence has satisfied his burden of proof if the evidence, taken as a whole, shows that the fact sought to be proven is the most plausible explanation for what occurred and that no other mutually exclusive fact can as reasonably explain the outcome. Marcel, 492 So.2d at 108; Standard, 408 So.2d at 458; Blanchard, 394 So.2d at 635.
After a thorough review of the record in the case sub judice, we cannot say that the factual finding of the trial court that the foreign substance on the road came from the Ormet facility was manifestly erroneous. The circumstantial evidence introduced by the plaintiff showed that it was possible, and indeed probable, that the material was dropped or tracked by a truck exiting the Ormet facility. Ormet, on the *97 other hand, introduced no evidence which tended to show that the material could have been dropped or tracked by any other trucks except those exiting its facility. There is not one iota of testimony or other evidence in the record as to the volume and nature of the traffic on that particular road that would tend to show that the material could have been dropped or tracked by trucks other than those exiting the Ormet facility. There was no evidence that other industries located along highway 44 commonly used barite or that barite was otherwise commonly transported on highway 44.
Since there was no evidence introduced as to some other reasonable explanation for the foreign substance on the road besides that it was dropped or tracked from a truck exiting the Ormet facility, the trial court had little choice other than to make the finding that it made. This assignment of error lacks merit.

DEFENDANT'S ASSIGNMENT OF ERROR TWO
By this assignment of error Ormet contends that the trial court erred in finding that Ormet was negligent in allowing the gate to be open and unattended, by allowing the material to be tracked or dropped on the roadway, and for failing to clean it up prior to the accident at issue.
The finding by the trial court that the gate was open and unattended is somewhat ambiguous. Although the trooper did testify to that effect, as we pointed out in footnote two, he was obviously referring to the main gate, not the one near the scene of the accident. If the trial court was referring to the North gate when he made this finding, he was in error; if he was referring to the main gate, he was correct. However, the fact that the main gate was open and unattended at the time of the accident is not causally related to the accident, which occurred near the North gate.
However, this erroneous factual finding by the trial court in no way affects the ultimate conclusion that Ormet was negligent in allowing the material to be tracked or dropped onto the road by a truck or trucks exiting its facility, and that Ormet was negligent in failing to clean it up prior to the accident at issue.
A property owner, or as in this case, a lessee, is responsible for damages resulting from a defect or obstruction in an adjoining highway where he has created the hazardous condition or endangered the plaintiff by his negligence. Arata v. Orleans Capitol Stores, Inc., 219 La. 1045, 55 So.2d 239 (La.1951); Allemand v. Zip's Trucking Co., Inc., 552 So.2d 1023 (La.App. 1st Cir. 1989), writ denied, 558 So.2d 569 (La.1990); Page v. Green, 306 So.2d 847 (La.App. 2nd Cir.1975). The determination as to the negligence of a party is made by applying the duty-risk analysis; i.e. does the party owe a legal duty to the plaintiff, and, if so, does the duty extend to the particular risk of harm encountered by the plaintiff.
We are of the opinion that a business entity such as Ormet, that has substantial truck traffic exiting its property, and that has actual or constructive notice that material is sometimes dropped or tracked onto the highway by trucks exiting its property, has a duty to monitor that exit to insure that material does not fall onto or get tracked out onto the highway. Further, a duty exists to warn motorists of any material that does get dropped or tracked out near the point of entry onto the highway from its property, as well as a duty to clean up any such material within a reasonable time. This duty clearly extends to a motorist who loses control of his vehicle due to the presence of such material on the highway.
Since the trial judge found that the material present in the road at the time of plaintiff's accident was a cause in fact of the accident, and that it came from the Ormet facility, it was not error considering the duty enunciated above for the trial court to find that Ormet was negligent in allowing the material to get there in the first place and thereafter failing to take remedial measures such as warning motorists or removing the material. This assignment of error lacks merit.

*98 DEFENDANT'S ASSIGNMENT OF ERROR THREE
By this assignment of error Ormet contends that the judgment rendered by the trial court is in conflict with its written reasons for judgment. Specifically, Ormet contends that the written reasons for judgment indicate that Ormet should only be held liable for forty percent of the plaintiff's damages, but that the judgment as rendered has the effect of casting them for ninety percent of plaintiff's damages. Ormet contends that the trial court misconstrued the law of solidary liability and only intended that Ormet pay forty percent of plaintiff's total damages. Ormet cites the following language in the trial court's written reasons for judgment in support of this contention:
All other parties including the unknown driver who spilled the material, the State of Louisiana D.O.T.D. who took no corrective or warning measures after weeks of hauling activities and all other former defendants collectively were 50% negligent.
No judgment will be rendered against [these] defendants because they are not defendants at the present time.
....
Plaintiff's total award is decreased by 10% due to her comparative negligence. It decreased an additional 50% due to the negligence of other defendants who were not sued or released prior to trial. Her recovery as to the remaining defendant Ormet Corporation is 40% as indicated above.
The judgment simply apportions fault among the parties at forty percent to Ormet, ten percent to the plaintiff, and fifty percent to "[a]ll other defendants."[3]
Ormet contends that in order to comport with the trial court's reasons for judgment, the judgment must be amended to apportion fifty percent of the fault to the DOTD, a party released by the plaintiff, rather than to "all other defendants." Ormet argues that by amending the judgment in this manner they will be entitled to a credit for the percentage of fault attributable to the settling parties (the DOTD), as was the intention of the trial court.
We first note that a trial court's written reasons for judgment form no part of the judgment itself, and where there is a conflict between the judgment and the written reasons the judgment controls. Owens v. U.S. Home, Inc., 552 So.2d 998 (La.App. 1st Cir.1989). We will treat this assignment of error as one alleging the incorrectness of the apportionment of fifty percent of the fault to all other "defendants" collectively, including the unknown driver, rather than to the DOTD.
Ormet is correct in its assertion that the trial court misconstrued the law of solidary liability in his written reasons for judgment. The plaintiff's recovery should be reduced by the percentage of fault attributable to settling defendants, but not by the percentage of fault of third persons not made a party to the suit or defendants dismissed from the suit. Dill v. State Department of Transportation and Development, 545 So.2d 994 (La.1989); Efferson v. State Department of Transportation and Development, 463 So.2d 1342 (La.App. 1st Cir.1984), writ denied, 465 So.2d 722 (La. 1985).
The trial court apportioned the fault of several "defendants" collectively at fifty percent, and then indicated in its written reasons that the plaintiff's recovery should be reduced by that percentage. However, one of these "defendants" cited by the trial court in its written reasons, was the unknown driver who spilled the material and was never made a party to the suit.[4] Some *99 of these defendants were simply dismissed from the suit. The plaintiff's recovery should not be reduced by whatever percentage of fault is attributable to the unnamed co-tortfeasor or the defendants who were dismissed from the suit. Therefore, the correct reduction of the plaintiff's recovery cannot be determined from the judgment as written, as it merely apportions fault to these various "defendants" collectively.
Since the complete record of the proceeding below is before us we will apportion the percentage of fault attributed by the trial court to these "other defendants" among them so that the proper reduction can be made to the plaintiff's award.
The trial court held that the unknown driver, the DOTD, and all other former defendants, i.e. Burnside Terminal, the Port Commission, and ITO and its insurer, were collectively, fifty percent negligent. To be liable in negligence the DOTD must have had actual or constructive notice that a dangerous condition or defect existed. Watson v. State Department of Transportation and Development, 529 So.2d 427 (La.App. 1st Cir.), writ denied, 533 So.2d 361 (La.1988). No evidence was adduced at trial which showed that the DOTD had actual or constructive notice of the foreign substance in the road. Therefore, the trial court erred in assigning any percentage of fault to the DOTD.
Nor was sufficient evidence adduced at trial to hold Burnside Terminal, the Port Commission, or ITO and its insurer liable in negligence to the plaintiff. The trial court erred in assigning any percentage of fault to them.
The remaining co-tortfeasor, the unknown and unnamed truck driver who dropped the material on the road, although not technically held to be at fault in the judgment, must therefore be apportioned the full amount of fault attributable to the "other defendants" by the trial court, as there was ample evidence in the record that the material was indeed dropped or tracked onto the road from a truck, and it is clear from the trial court's written reasons that this was its intent. Ormet is not entitled to a credit for the percentage of fault attributable to this unnamed co-tortfeasor.
Therefore, the judgment will be amended to apportion fifty percent of the fault to the unknown and unnamed truck driver who spilled or tracked the material onto the road rather than simply "all other defendants."

DEFENDANT'S ASSIGNMENT OF ERROR FOUR
By this assignment of error Ormet contends that the trial court erred in assigning only ten percent of the fault to the plaintiff. The allocation of a particular percentage of fault to a party is a finding of fact. Motton v. Travelers Insurance Company, 484 So.2d 816 (La.App. 1st Cir. 1986); Gilder v. Branton, 471 So.2d 976 (La.App. 1st Cir.1985); Efferson, 463 So.2d at 1351. Findings of fact will not be set aside on appeal unless found to be manifestly erroneous. Rosell; Arceneaux.
Considering the evidence as a whole, and the factors set out in Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La.1985), we cannot say the trial court was manifestly erroneous in finding that the plaintiff was ten percent at fault. Although other vehicles passed over the substance on the road without incident, and the plaintiff failed to see the substance when she should have, this in itself is not sufficient to render the finding of ten percent of the fault attributable to the plaintiff manifestly erroneous.
While a motorist has a duty to watch where she is going, and is partially to blame if she hits something in the road that she should have seen but didn't, we cannot say that it is clearly wrong to assign only ten percent of the blame to a motorist who loses control of her vehicle after hitting a foreign substance on a wet, blacktopped road, just prior to entering a curve, notwithstanding that other vehicles were able to safely traverse the substance in the road. This assignment lacks merit.

QUANTUM
Before an appellate court will alter the quantum of a trial court's award, the *100 record must clearly reveal an abuse of the trier of fact's much discretion. Reck v. Stevens, 373 So.2d 498 (La.1979). A trier of fact has abused its much discretion only when the award is so excessively high or low that it shocks the conscience of the reviewing court such that it is compelled to correct the award. Hanzy v. Sam, 385 So.2d 355 (La.App. 1st Cir.), writ denied, 386 So.2d 357 (La.1980). Once the appellate court finds that an abuse of discretion has occurred and that an award should be raised or lowered, it can only raise or lower the award to the highest or lowest point which would have been within the trial court's discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).
Ormet contends in its final assignment of error, that the trial court did not consider the testimony of one of the plaintiff's treating physicians, Dr. Thomas Flynn, who testified that the plaintiff's active lifestyle may have hampered her recovery and prevented her injuries from healing properly.[5] Ormet contends that as a result of the trial court's failure to consider this testimony, that the award of general damages made by the trial court was excessive and manifestly erroneous.
The plaintiff has also appealed, alleging that the award of one hundred and fifty thousand dollars ($150,000.00) in general damages made by the trial court is too low and manifestly erroneous. In order to determine whether the trial court abused its much discretion in awarding general damages to the plaintiff, a detailed analysis of the plaintiff's injuries is required.[6]
After being transferred to Baton Rouge General Hospital on the day of the accident, Mrs. Babin was seen by Dr. Thomas Flynn, a neurosurgeon, who diagnosed her injury as a fracture of the odontoid process, or in common terms, a broken neck. The odontoid process is a bony structure between the first and second cervical vertebrae, and provides stability to the neck at the base of the skull. Mrs. Babin had a fracture, or break, all the way through this structure. There was no neurological damage present (the spinal cord was not damaged), and no subsequent damage to the spinal cord has occurred.
Mrs. Babin was placed in what is known as Trippi Wells Tongs on the day of the accident. This is a traction device which immobilizes the head and neck so that the head cannot be moved at all in relation to the rest of the body. It consists of a brace which is attached by means of four screws that are screwed into the skull. The Trippi Wells Tongs remained on Mrs. Babin for five days.
On the fifth day after the accident Mrs. Babin was taken out of traction and put in a halo brace. This device is also attached to the skull by means of four screws and is connected to a harness that fits over the patient's torso. It also completely immobilizes the head and neck in relation to the rest of the body. Mrs. Babin testified that when the halo brace was first put on, and she was helped into a sitting position, that she passed out from the pain.
*101 The day after the halo brace was put on, Mrs. Babin began physical therapy to learn how to move around with it on, since it severely limits one's movement and affects balance. The entire upper body, from the waist up, moves as one unit when the halo brace is on. On November 1, 1983, ten days after the accident, Mrs. Babin was discharged from Baton Rouge General.
After she was discharged from the hospital, Mrs. Babin moved in with her mother and stayed there with her two children for approximately two months. Mrs. Babin needed assistance to do almost anything with the halo brace on, especially in the beginning. She testified that it was about one month before she could move around with the halo brace on without being afraid that she would fall, and this was especially debilitating in light of the fact that she had been advised by her doctor that a fall would likely kill her. The halo brace could not get wet, therefore Mrs. Babin could only take sponge baths while it was on, and had to have assistance to do so. The four pin sites, where the screws went into the skull, had to be cleaned three times a day with hydrogen peroxide to prevent infection.
On November 14, 1983, two weeks after being discharged from the hospital, Mrs. Babin was readmitted because the screws going into the right side of her skull came loose. Since this allowed movement of her head, it caused the vertebrae in the area of the fracture to get out of alignment. As a result, Mrs. Babin had to be placed under general anesthesia to have the vertebrae realigned and the screws reinserted. She spent a total of five days in the hospital for this and was discharged on November 18, 1983. Following this, Mrs. Babin had to go in to have the screws tightened once a week.
Mrs. Babin was next admitted to the hospital on February 21, 1984, approximately four months after the accident. At that time Dr. Flynn removed the halo brace and flexed her neck while conducting a fluoroscopic examination. A fluoroscope is similar to an x-ray, and the purpose of this procedure was to determine how well the odontoid process was healing. It appeared to Dr. Flynn that the fracture was stable and healing, although no new bone formation was visible.
Mrs. Babin testified that when the halo brace was removed, she passed out because her head "felt like it weighed 200 pounds." After the halo brace had been removed, and the fluoroscopic exam completed, Mrs. Babin was put into a less cumbersome brace called a Somi brace. This brace did not require screws in the skull but rather fits over the shoulders, under the chin, and up the back of the head. It prevents movement of the head in relation to the body, although not to the same extent as the halo brace. Mrs. Babin was discharged from the hospital on February 23, 1984, and was required to wear the Somi brace at all times except when she was prone in bed, so that she could sleep.
On May 10, 1984, Dr. Flynn took Mrs. Babin out of the Somi brace and she began wearing a soft cervical collar. Dr. Flynn testified that he cautioned her about unusually active undertakings at this time because he got the impression that she had been riding a motorcycle. He testified that the fracture was stable and appeared to be healing at that time, so he discontinued the bi-weekly exams and asked to see her again in November.
In July of 1984, Mrs. Babin began seeing Dr. John Dupont, a dentist, for problems she was having with her jaw. Dr. Dupont testified that she had soreness in the jaw and headaches, and that he diagnosed her problems as TMJ, or temporomandibular joint syndrome. He was of the opinion that the trauma to the neck in combination with the neck braces which restricted Mrs. Babin's jaw movement was the most likely cause of this condition.
He fitted Mrs. Babin with an oral splint which she wore at night for approximately one year. Mrs. Babin testified that when she found out that she needed surgery on her neck she discontinued wearing the oral splint and stopped seeing Dr. Dupont, but that she still has jaw problems and plans to return to him in the future.
*102 In January of 1985 Mrs. Babin went back to work as a hairdresser for the first time since the accident. She started slowly at first, only taking one or two customers a day. About this same time she started complaining to Dr. Flynn of increasingly painful headaches and muscle spasms in her neck. By June of 1985 she was working full time and complaining of numbness and tingling in her arms along with almost constant headaches.
X-rays ordered by Dr. Flynn on June 20, 1985 indicated that Mrs. Babin's neck was not healing properly and that surgery was required. Specifically, Dr. Flynn testified that the x-rays showed aseptic necrosis of the odontoid with instability of the C-1, C-2 and C-3 vertebrae. This is a condition where, because the fracture had failed to heal, the odontoid bone was not being supplied with blood and was dissolving or being absorbed by the body. Dr. Flynn attributed Mrs. Babin's headaches and neck pain to this condition, which he indicated appeared to have existed for four or five months judging from the amount of absorption of the bone.
Mrs. Babin was admitted to the hospital on June 28, 1985, and the next day Dr. Flynn performed surgery. He fused together Mrs. Babin's C-1, C-2, and C-3 cervical vertebrae using stainless steel wire and methyl methacrylate, a plastic prothesis. The halo brace was again screwed back onto Mrs. Babin during this surgery. Mrs. Babin was discharged after five days in the hospital, and instructed to follow the same cleaning and tightening procedures with regard to the halo brace as she did the first time she wore it.
On July 17, 1985, Dr. Flynn removed the halo brace and Mrs. Babin was put back in the Somi brace. X-rays showed that the surgery was successful, and on August 6, 1985, Dr. Flynn reduced the time Mrs. Babin had to wear the Somi brace to one half of each day. The surgery, while successful mechanically, did nothing to relieve Mrs. Babin's constant painful headaches, and she has been taking either prescription or non-prescription pain medicine almost continuously since the accident to try and alleviate them.
Mrs. Babin went back to work as a hair dresser in January of 1986, and again worked gradually up to full time. In an effort to relieve her persistent headaches, Mrs. Babin began seeing Dr. Proctor, a neurologist at Baton Rouge General, and continued to see him up until July of 1986, but apparently got no relief.
Still suffering from constant headaches, in July of 1986, Mrs. Babin began going to Ocshner Clinic where she was seen by physicians in several departments and ultimately began EMG biofeedback treatments. These treatments are designed to teach a patient how to control muscle tension which is one of the causes of headaches.
On November 19, 1986, she started seeing Dr. Stephen Kishner, a physical medicine and rehabilitation specialist at Ocshner, and he started her on TENS unit treatments and continued the biofeedback treatments. TENS unit treatment is a process whereby nerves are stimulated electrically in an attempt to alleviate pain.
These treatments continued until x-rays taken on February 10, 1987 revealed that the main wire holding together her fused vertebrae was broken. Dr. Edward Connelly, a neurosurgeon at Ocshner, was then consulted, and he advised Mrs. Babin that the broken wire allowed the fused vertebrae to move slightly, and that this movement might be causing or contributing to her headaches. However, the only way to be certain whether or not the broken wire was contributing to her headaches, was to re-fuse the vertebrae. Since nothing else seemed to be working, Mrs. Babin agreed to the surgery.
Mrs. Babin was admitted to Ocshner on March 9, 1987, and Dr. Connelly performed surgery the next day. He removed the wire and acrylic from the previous surgery, and re-fused the three vertebrae using a piece of bone removed from Mrs. Babin's ilium, or pelvis, and stainless steel wire.
Mrs. Babin was discharged on March 17, 1987, after a total of eight days in Ocshner Clinic. In addition to the incision on the *103 back of her neck in the same place as the first operation, she also had a five inch scar on her hip and a limp for two months. Following this second surgery she wore a Philadelphia collar, which is similar to the Somi brace, for three and one half months.
After this second surgery her headaches still persisted and she resumed TENS and biofeedback treatments with Dr. Kishner, but testified that these treatments do not provide much relief. At the time of trial she was going to physical therapy three times a week and was back working as a hairdresser.
As to the extent of her disability, Dr. Flynn testified that as of the time that he stopped treating her, that she had a fifteen percent disability of the entire body with diminished cervical range of motion. Dr. Kishner testified that Mrs. Babin will continue to have persistent, continued, chronic neck pain that could last the rest of her life, and may flare up from time to time, but that she should be able to continue her usual daily routine of working as a hairdresser.
There is no merit to Ormet's contention that the trial court did not consider Dr. Flynn's testimony when awarding damages. The trial court watched the video of Dr. Flynn's deposition during the trial along with everyone else. Dr. Flynn was the only one of the three treating physicians who testified via video deposition that he was of the opinion that Mrs. Babin's active lifestyle hampered her recovery and possibly exacerbated her injuries. Indeed, the award of only one hundred and fifty thousand dollars to the plaintiff in general damages can only be explained, in our opinion, by the trial court giving great weight to Dr. Flynn's testimony that he believed that Mrs. Babin's active lifestyle increased the risk of complications.
Considering the injury sustained by Mrs. Babin and the numerous treatments, including two cervical fusions, she underwent, together with the extended periods of time she was forced to wear the various restrictive prosthetic devices, including the ones that screwed into her skull, and the fact she has suffered, and will in all likelihood continue to suffer from chronic neck pain and headaches, it shocks our conscience that the trial court only awarded her one hundred and fifty thousand dollars ($150,000.00) in general damages. Even considering the testimony of Dr. Flynn, the award of this amount of general damages unquestionably constitutes an abuse of the trial court's discretion as being too low.
Since we have determined that the award of general damages is too low, we must raise the award to the lowest amount which would have been in the trial court's discretion. Although no two cases are exactly alike, and each award of damages must be based on the facts of that particular case, prior awards under similar circumstances may serve as a general guide in determining whether the trial court abused its much discretion. Therefore, a review of the jurisprudence for general damage awards for injuries similar to the plaintiff's is appropriate.
In Lute v. City of Lake Charles, 394 So.2d 736 (La.App. 3rd Cir.1981), a general damage award[7] of five hundred twenty two thousand one hundred eighty two dollars and fifteen cents ($522,182.15), to a plaintiff for a fracture of the cervical spine at C-4/5 level with diffuse nerve damage was upheld by the Third Circuit as within the jury's discretion. The plaintiff in that case, Mr. Lute, was initially placed in a Barton Tong Brace, which attaches to the skull, in order to immobilize the head and neck and provide traction. This brace remained on for approximately one month. Mr. Lute's initial hospital stay lasted approximately two months, and he was placed in a hard cervical collar upon discharge.
Shortly after his discharge, Mr. Lute was readmitted to the hospital and underwent a foraminotomy, a laminectomy, and cervical fusion of the C-5/6 and C-6/7 vertebrae.
*104 Mr. Lute subsequently underwent wrist surgery to release the pressure on the nerves in his wrist and ease the pain in his hands. Mr. Lute also underwent various treatments in an attempt to cure his impotency caused by the pain associated with the pinched nerves in his neck. Mr. Lute will probably suffer almost constant pain in his neck and shoulders due to the nerve damage and has limited range of motion in them due to the fusion. He was admitted to the hospital a total of ten times and spent a total of eighty days therein due to his injuries.
In Fuqua v. Aetna Casualty & Surety Company, 542 So.2d 1129 (La.App. 3rd Cir.), writ denied, 548 So.2d 310 (La.1989), a general damage award of four hundred and two thousand dollars ($402,000.00), awarded for a broken neck, contusion to the spinal cord and severe concussion was upheld as not being an abuse of the trial court's discretion.
In Fuqua, the plaintiff, Mr. Fuqua, was in traction for four weeks with tongs holding his neck and skull in the proper position. Thereafter, surgery was performed on his neck and he remained immobilized for another eight days. When discharged from the hospital, Mr. Fuqua wore a cervical brace for six to eight weeks and a soft collar for another several weeks. The range of motion of Mr. Fuqua's neck is permanently limited, and he was still in pain at the time of trial.
In Dill v. State Department of Transportation and Development, 522 So.2d 1288 (La.App. 5th Cir.1988), an award of two hundred thousand dollars ($200,000.00) in general damages for pain and suffering associated with a fractured odontoid and subsequent immobilization with a halo brace was upheld as not being an abuse of discretion.[8] Although this is precisely the same type of injury as that suffered by Mrs. Babin, the plaintiff's recovery in Dill was not nearly as protracted and involved as was Mrs. Babin's.
Upon Mrs. Dill's arrival at the hospital following her accident, she was diagnosed as having a fracture of the odontoid, part of the C-2 vertebrae, and her head was immobilized using a Philadelphia collar. Several days later, while still in the hospital, Mrs. Dill underwent surgery and was fitted with a halo brace like the one Mrs. Babin wore. Mrs. Dill remained in the hospital for approximately fifteen days, and wore the halo brace for a total of three months. She then wore a Philadelphia collar for approximately two months and a soft collar for another two months. Mrs. Dill has a five percent anatomical disability and a fifty percent functional disability, and still complains about occasional dizziness.
Mrs. Babin, on the other hand, underwent two cervical fusions, had to be placed under general anesthesia another time to re-tighten the halo, wore the halo for a total of five months, wore the somi brace and/or Philadelphia collar for a total of eight months and a soft collar for a total of about two months, continues to experience frequent severe headaches and muscle spasms, and has at least a fifteen percent disability of her entire body. The seriousness of Mrs. Babin's injury and length of her recovery is more analogous to those of Mr. Lute and Mr. Fuqua than Mrs. Dill.
In light of the above comparable cases, we feel that the lowest amount of general damages which the trial court could have awarded Mrs. Babin is three hundred and fifty thousand dollars ($350,000.00), and we hereby increase her general damage award to that amount.
Therefore, the trial court's judgment is reversed in part and amended to provide that the unknown and unnamed truck driver who spilled or tracked the foreign material onto the road is fifty percent at fault, and the plaintiff's award for general damages is amended and increased to three hundred and fifty thousand dollars ($350,000.00). The judgment is affirmed in all other respects. Costs of this appeal are to *105 be assessed to the defendant, Ormet Corporation.
REVERSED IN PART; AMENDED AND AFFIRMED IN PART.
CARTER, J., concurs in the result.
NOTES
[1] The judgment simply state that "[a]ll other defendants are fifty (50%) percent at fault." The trial court's written reasons for judgment states that "[a]ll other parties including the unknown driver who spilled the material, the State of Louisiana D.O.T.D. who took no corrective or warning measures after weeks of hauling activities and all other former defendants collectively were 50% negligent." No judgment was rendered against these co-tortfeasors because they had either been previously dismissed from the suit or in the case of the truck driver, had never been made a party to the suit.
[2] The trooper's testimony concerning the unattended guard shack and open gate was in response to questions concerning whether he talked to anyone at the Ormet facility while he was at the scene of the accident. Ormet's representative at trial, Mr. Lyndon Williams, testified that the gate near the scene of the accident was always closed and locked unless it was in use. His testimony was supported by documentary evidence. Aerial photographs introduced into evidence show there was no guard shack at the gate involved in this litigation, but there was one at the main gate, located to the south of the accident scene. This is the gate the trooper was apparently referring to.
[3] Since the unknown driver was never made a defendant, the judgment did not actually assign any fault to this unknown driver even though it is clear from the trial court's written reasons that it was his intention to include the unknown driver in the 50% apportionment of fault.
[4] Although no judgment can be rendered against one not a party to a suit; in this case the unknown driver who spilled the material, the trial court was correct to consider this person's negligence and assign a percentage of fault to him. See, Veal v. Forrest, 543 So.2d 1121 (La. App. 1st Cir.1989); and Varnado v. Continental Insurance Company, 446 So.2d 1343 (La.App. 1st Cir.1984).
[5] Dr. Flynn testified via video deposition introduced into the record and played during the trial. A transcript of this deposition was also introduced into evidence. Dr. Flynn testified that Mrs. Babin's halo brace came loose more than normal and that this increased the risk of complication such as non-union or aseptic necrosis of the odontoid process.

He testified that on at least one occasion the halo had been deliberately loosened, and that he felt that Mrs. Babin had ridden a motorcycle during the latter part of his treatment of her against his advice. However, he also testified that he was not of the opinion that any particular activity performed by Mrs. Babin was necessarily the cause of the complications which later developed, only that they tended to increase the risk that they would occur. He testified that there was normally a twenty percent chance of the type of complications which occurred, given an injury such as Mrs. Babin's.
[6] Because of the extensive nature and length of Mrs. Babin's treatment, we will only chronicle the hospital visits, procedures performed, and general symptoms relative to her injury. However, we wish to point out that during the course of Mrs. Babin's treatment she had many regularly scheduled office visits and exams that we will not include in our discussion because of their number. We also note that Mrs. Babin was taking various prescription and non-prescription pain and muscle relaxer type medication throughout the course of her treatment all the way up until the time of trial.
[7] The jury actually made an undifferentiated lump sum award of six hundred ninety three thousand seven hundred fifty dollars ($693,750.00). The Lute court subtracted the amount of the medical bills and what it considered to be the highest award the jury could have made for loss of income to arrive at this general damage figure.
[8] The Louisiana Supreme Court amended and affirmed Dill at 545 So.2d 994 (La.1989). However the Supreme Court's opinion dealt only with the issue of liability and did not address quantum.